ORIGINAL

FILED

08 MAR -7 PM 3: 57

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:            CP            DEPUTY

ROBERT JYSTAD (Bar No. 187340)
JULIAN K. QUATTLEBAUM (Bar No. 214378)
JAMIE T. HALL (Bar No. 240183)
CHANNEL LAW GROUP, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802-4323
Telephone: (310) 982-7197
Facsimile: (562) 216-5090

Attorneys for Plaintiff,
AMERICAN TOWER CORPORATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN TOWER CORPORATION, A DELAWARE CORPORATION, | Case No. '08 CV 0435 JM CAB |
| | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, WRIT OF MANDAMUS, DAMAGES, COSTS, AND ATTORNEY'S FEES |
| Plaintiff, | |
| vs. | |
| THE CITY OF SAN DIEGO, CALIFORNIA, A POLITICAL SUBDIVISION OF THE STATE OF CALIFORNIA, | |
| Defendant. | |

BY FAX

**BRIEF STATEMENT OF THE CASE**

1.     Plaintiff American Tower Corporation, a Delaware corporation ("ATC"), hereby complains against Defendant, the City of San Diego, California, a political subdivision of the State of California ("City") and brings this action to redress and to remedy the City's violation of federal and state laws in its denial of ATC's Conditional Use Permit ("CUP") No. 289980 related to a 90-foot monopole supporting wireless telecommunication antennas (the "Border Facility") located in the vicinity of 4350 Otay Mesa in the City and the City's failure to grant ATC's request for a Planned Development Permit in connection with its CUP application.

2.     ATC owns or manages telecommunications infrastructure, including

1

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

telecommunication towers such as the Border Facility, and its customers are usually wireless

carriers and include, among others, Sprint-Nextel Corporation, Cingular Wireless (now known as

AT&T), Verizon Wireless, T-Mobile, MetroPCS Communications, Inc., and Leap Wireless

International, LLC (doing business in the San Diego market under the trade name "Cricket").

3.      There is currently pending before this Court a related action brought by ATC

against the City and certain related defendants (*American Tower Corporation v. City of San

Diego, et al.*, Case No. 07cv0399 LAB (NLS)).

4.      The Border Facility was constructed pursuant to CUP No. 94-0548 (the "Original

CUP"), which was granted by the San Diego City Council (the "City Council") effective October

3, 1995.  True and correct copies of the Original CUP as initially issued and the August 15, 2000

corrected version thereof are attached as Exhibit 1.  In Resolution R-286390, the City Council

made certain findings in support of its grant of the Original CUP.  Specifically, the City Council

found:

"1. The proposed use . . . will not adversely affect the General Plan or the Community

Plan.

" . . .

"2. The proposed use, because of conditions that have been applied to it, will not be

detrimental to the health, safety and general welfare of persons residing or working in the

area and will not adversely affect other property in the vicinity.

" . . .

"3. The proposed use will comply with the relevant regulations in the Municipal Code."

Resolution R-286390, attached as Exhibit 2.

5.      On or about December 2, 2005, ATC, as successor in interest to the owner of the

Border Facility, submitted an application for a renewal of the Original CUP and also requested

approval of a Planned Development Permit.  ATC's Site Justification Letter, submitted as part of

its application, is attached hereto as Exhibit 3.  On February 7, 2008, the City's Planning

Commission (the "Planning Commission") voted to deny the CUP requested by ATC.  On or

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Channel Law Group, LLP**
100 Oceangate, Suite 1400
Long Beach, CA 90802

2

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

1  about February 15, 2008, ATC's representative, James Kelly, received, in an envelope

2  postmarked February 12, 2008, a letter dated February 7, 2008 from Karen Lynch-Ashcraft,

3  Project Manager in the City's Development Services Department ("DSD"), to which an unsigned

4  copy of Planning Commission Resolution No. 4366-PC was attached. A true and correct copy of

5  said letter and unsigned resolution is attached hereto as Exhibit 4. The decision of the Planning

6  Commission denying the above referenced CUP is final and nonappealable to any higher

7  authority within the City. ATC, therefore, is compelled to bring this litigation challenging the

8  City's final decision on ATC's application as unlawful under federal and state law.

9      6.      ATC seeks a declaration from the Court that the decision issued by the Planning

10  Commission on ATC's application violates the Telecommunications Act of 1996, specifically

11  multiple provisions of 47 U.S.C. § 332, as well as the Equal Protection Clause of the Fourteenth

12  Amendment to the U.S. Constitution. Additionally, ATC seeks a writ of mandate from the Court

13  ordering the City to issue a CUP and/or such other permit or permits as may be necessary for the

14  continued maintenance and operation of the Border Facility, as well as damages, attorney's fees

15  and costs.

16  **JURISDICTION AND VENUE**

17      7.      This action arises under the laws of the United States and the State of California,

18  including the federal Supremacy Clause, U.S. Const. art. VI, cl. 2; the Fourteenth Amendment to

19  the United States Constitution; the federal Communications Act of 1934, as amended by the

20  Telecommunications Act of 1996 (the "Communications Act"), 47 U.S.C. §§ 151 *et seq.*; and the

21  California Permit Streamlining Act, California Government Code §§ 65920 *et seq.* The Court

22  has primary jurisdiction over federal law claims pursuant to 28 U.S.C. § 1331 (federal question

23  jurisdiction) and over state law claims pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).

24  ATC is a Delaware corporation with its corporate headquarters in Boston, Massachusetts, and the

25  City is a political subdivision of the State of California. ATC's damages exceed $75,000

26  exclusive of costs. The Court also has supplemental jurisdiction over California state law claims

27  pursuant to 28 U.S.C. § 1367. The Court's authority to grant declaratory relief is based upon 28

28

3

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

U.S.C. § 2201.  The Court's authority to grant mandamus relief is based upon its inherent authority under the Communications Act or, in the alternative, California Code of Civil Procedure § 1094.5.

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendant resides within this district and a substantial part of the events or omissions giving rise to the claim occurred within this district.

## PARTIES

9.    Plaintiff ATC is a Delaware corporation with its principal place of business at 116 Huntington Avenue, Boston, Massachusetts 02116.  ATC is an independent owner, operator and developer of broadcast and wireless communications sites in the United States, Mexico and Brazil.  ATC owns and operates over 22,000 sites in the United States, Mexico and Brazil.  Additionally, ATC manages approximately 2,000 rooftop and tower sites owned by other parties.

10.    ATC owns or manages telecommunications infrastructure, including telecommunication towers such as that at issue in this case, and its customers are usually wireless carriers, that is, providers of personal wireless services or commercial mobile radio services.  ATC is not limited to serving any specific type of wireless carrier, although the majority of its customers provide cellular or personal communication services or some combination thereof.  ATC's infrastructure constitutes "personal wireless service facilities" within the ambit of 47 U.S.C. § 332(c)(7)(B).

11.    Defendant City of San Diego, California is a charter city organized under the laws and Constitution of the State of California.  In taking the actions complained of herein, the City acted through, among others, the City Council, the Planning Commission, the DSD and certain staff, employees and agents responsible to these entities.

## FACTUAL BACKGROUND

### I.  ATC's Conditional Use Permit ("CUP")

12.    On or about June 24, 2005, ATC's predecessor, SpectraSite Communications, Inc., met with Senior Planner Karen Lynch-Ashcraft and Planning Intern Simon Tse at the DSD

4

to discuss the renewal of eight CUPs, including the Original CUP. Ms. Lynch-Ashcraft identified Mr. Tse as the principal point of contact on CUP renewals. The goal of the meeting was to enlist the cooperation of the City in moving renewals forward on a timely basis, to request that SpectraSite be allowed to prioritize sites on the basis of expiration dates and new tenant interest and overall to demonstrate to the City SpectraSite's desire to be upfront with the City in addressing renewal and compliance issues and to work in partnership with tower tenants, the City staff, and the community to achieve a mutually satisfying outcome.

13.    As indicated above, ATC filed its application for renewal of the Original CUP on or about December 2, 2005. Plaintiff is informed and believes that the City did not, within 30 days thereafter, make a written determination whether such application was complete.

14.    On or about March 20, 2006, in a meeting among ATC, several wireless carriers and representatives of the City, the City agreed to a blanket extension of the terms of any expired CUPs to June 1, 2007. Letter from Robert Jystad to Mr. James Waring dated March 3, 2006, attached as Exhibit 5.

15.    On September 12, 2007, the City's Hearing Officer denied the CUP requested by ATC. On September 21, 2007, ATC timely appealed the Hearing Officer's decision to the City's Planning Commission. As part of its presentations to both the Hearing Officer and the Planning Commission, ATC proposed certain modifications to the Border Facility in an attempt to respond to the City's alleged concerns about aesthetics. As indicated above, on February 7, 2008, the Planning Commission denied CUP No. 289980 and also denied a Site Development Permit for which ATC had never applied. Neither the Hearing Officer nor the Planning Commission ruled on ATC's request for a Planned Development Permit made in connection with its request for a CUP.

II.    THE CITY OF SAN DIEGO WIRELESS REGULATIONS

A.    The Land Development Codes

16.    ATC's Protest Application is governed by § 141.0405 of the City's Land Development Code as it was in effect prior to April 11, 2007. A true and correct copy of said

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

5

section as then in effect is attached hereto as Exhibit 6.

17.    Under Prior § 141.0405, "minor telecommunication facilities" were required to be "concealed from public view or integrated into the architecture or surrounding environment through architectural enhancements (enhancements that complement the scale, texture, color, and style), unique design solutions, or accessory use structures." Land Development Code § 141.0405(e)(1).

18.    The requirements for approval of "major telecommunication facilities" (*i.e.*, communication antennas that do not qualify as "minor telecommunication facilities") other than certain locational restrictions not applicable to the Border Facility, were merely that they be "designed to be minimally visible through the use of architecture, landscape architecture, and siting solutions" and that they "use the smallest and least visually intrusive antennas and components that meet the requirements of the facility." Land Development Code § 141.0405(f).

19.    Under § 126.0305 of the City's Land Development Code, the following are the findings required for a Conditional Use Permit:  (a) The proposed development will not adversely affect the applicable land use plan; (b) The proposed development will not be detrimental to the public health, safety, and welfare; (c) The proposed development will comply to the maximum extent feasible with the regulations of the Land Development Code; and (d) The proposed use is appropriate at the proposed location.

20.    The City indicated in its Cycle Issues Report, which was transmitted to Doug Kearney of ATC by letter from Karen Lynch-Ashcraft dated January 19, 2006, that a Planned Development Permit would be required for a height deviation from the 30 foot height limit in the RS-1-7 zone.  A copy of this letter and the Cycle Issues Report is attached hereto as Exhibit 7. The purpose of a Planned Development Permit is articulated in § 143.0401 of the Land Development Code: "The purpose of these regulations is to provide flexibility in the application of development regulations for projects where strict application of the base zone development regulations would restrict design options and result in a less desirable project." San Diego Mun. Code § 143.0401.  ATC has consistently pursued a Planned Development Permit throughout the

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

6

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

CUP Review Process, both in support of retention of the existing height and to permit any other nonconformance with the development regulations of the applicable zone necessary for the continued operation of this critical infrastructure.

21.    The findings required for a Planned Development Permit under § 126.0604 of the Land Development Code are as follows:  (a) The proposed development will not adversely affect the applicable land use plan; (b) The proposed development will not be detrimental to the public health safety and welfare; (c) The proposed development will comply with the applicable regulations of the Land Development Code; (d) The proposed development, when considered as a whole, will be beneficial to the community; and (e) Any proposed deviations pursuant to § 126.0602(b)(2) are appropriate for this location and will result in a more desirable project than would be achieved if designed in strict conformance with the development regulations of the applicable zone.

## III.    THE FEDERAL COMMUNICATIONS ACT

22.    Congress adopted the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.,* and thereby created the Federal Communications Commission for, among other purposes, "…regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination . . . , a rapid, efficient, nationwide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies . . . ."

23.    In 1996, Congress amended the Communications Act of 1934 by enacting the Telecommunications Act of 1996 ("TCA").  The TCA is expansive legislation intended to increase and improve competition in the telecommunications industry.  An important purpose of the TCA, as described by the Conference Report to the Senate Bill, is to "accelerate rapidly private sector deployment of advanced telecommunications and information technologies and

7

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

services to all Americans by opening all telecommunications markets to competition . . . ." H.R. Conf. Rep. No. 458, 104th Cong., 2d Sess. 1 (1996).

24.    In enacting the Telecommunications Act, Congress gave due consideration to the potential conflict between state and local government regulation and the national need for deployment of advanced telecommunications and information technologies.

25.    Section 332(c)(7)(B)(i)(I) states: "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--shall not unreasonably discriminate among providers of functionally equivalent services."

26.    Section 332(c)(7)(B)(i)(II) further provides that State or local government regulation of personal wireless service facilities "shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

27.    Section 332(c)(7)(B)(ii) provides that a State or local government shall "act on any request to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed . . . ."

28.    Section 332(c)(7)(B)(iii) states that "any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

IV.    **THE PERMIT STREAMLINING ACT (CAL. GOV. CODE §§ 65920 *ET SEQ.*)**

29.    Cal. Gov. Code § 65940(a) requires each state agency and each local agency to "compile one or more lists that shall specify in detail the information that will be required from any applicant for a development project." The section also requires the information to "be made available to all applicants for development projects and to any person who requests the information."

30.    Cal. Gov. Code § 65941(a) mandates: "The information compiled pursuant to Section 65940 shall also indicate the criteria which the agency will apply in order to determine

8

the completeness of any application submitted to it for a development project." All of this information is required, under Gov. Code § 65942, to be revised as necessary so as to "be current and accurate at all times." That section further provides: "Any revisions shall apply prospectively only and shall not be a basis for determining that an application is not complete . . . if the application was received before the revision is effective" with two narrow exceptions.

31.     Although an agency is permitted to defer requiring some of the information needed until after the completion of the application, Cal. Gov. Code § 65944(a) prohibits an agency which has accepted an application as complete from subsequently requesting information not specified in the list. "Prior to accepting an application, each public agency shall inform the applicant of any information included in the list prepared pursuant to Section 65940 which will subsequently be required from the applicant in order to complete final action on the application." Gov. Code § 65944(b).

32.     Cal. Gov. Code § 65943 sets forth the time limits for determining the completeness of an application. As to the initial submission of an application, subsection (a) of that section requires: "Not later than 30 calendar days after any public agency has received an application for a development project, the agency shall determine in writing whether the application is complete and shall immediately transmit the determination to the applicant for the development project. If the written determination is not made within 30 days after receipt of the application, and the application includes a statement that it is an application for a development permit, the application shall be deemed complete for purposes of this chapter."

33.     Cal. Gov. Code § 65943(a) also requires the government agency to specify in detail the shortcomings of any application deemed incomplete:

"If the application is determined not to be complete, the agency's determination
shall specify those parts of the application which are incomplete and shall indicate
the manner in which they can be made complete, including a list and thorough
description of the specific information needed to complete the application."

34.     Cal. Gov. Code §§ 65950-65952 sets forth mandatory time limits for approval or

9

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

disapproval of a development project. Gov. Code § 65956(b) provides that in the event of a failure by an agency to meet the required deadlines for approval or disapproval, "the failure to act shall be deemed approval of the permit application for the development project. However, the permit shall be deemed approved only if the public notice required by law has occurred." The statute provides specific means for the applicant to provide the required public notice if the lead agency fails to do so. Gov. Code § 65953 specifically *requires* agencies to act more quickly to the extent possible:

> "All time limits specified in this article are maximum time limits for approving or disapproving development projects. All public agencies shall, if possible, approve or disapprove development projects in shorter periods of time."

## SUMMARY OF HARM AND FACTS REQUIRING
## DECLARATORY AND INJUNCTIVE RELIEF

35. The foregoing allegations demonstrate that an actual controversy now exists between ATC and the City, due to the City's denial of ATC's CUP. The City's denial violates and is preempted by federal and state law and is, therefore, void and invalid. An actual controversy also now exists as to whether ATC is entitled to an order compelling the City to issue appropriate permits for the continued operation of ATC's Border Facility forthwith. ATC's rights, status and other legal relations have been immediately and adversely affected by the City's actions.

36. As a result of the City's actions complained of herein, ATC has been, and will continue to be, absent the relief requested herein, damaged and irreparably harmed. The harm caused by the City's unlawful denial of ATC's CUP includes, but is not limited to, the following: (a) ATC and both carriers utilizing the Border Facility, Nextel and T-Mobile (hereinafter "Tenants") will be required to remove and/or replace their equipment currently in operation and currently providing wireless communication services; (b) ATC and its Tenants will be required to reconfigure wireless communication networks in order to accommodate the loss and/or

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

10

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

modifications of the Border Facility; (c) ATC has expended substantial amounts of time and resources negotiating with the City over the renewal process applicable to its Border Facility CUP; (c) ATC is being deprived of the full utilization of ATC's existing licenses and business investments, as well as lost revenue for services; (d) ATC will lose customers due to the irreplaceable services as a result of the denial of the Border Facility CUP; and (e) ATC is being deprived of enhanced good will and business reputation associated with improved services that ATC could offer in the City with the renewal of its Border Facility CUP.

**COUNT I**

**Violation of Section 332(c)(7)(B)(i)(I) of the Telecommunications Act**

**(47 U.S.C. § 332(c)(7)(B)(i)(I))**

37.    ATC incorporates herein by reference the allegations of paragraphs 1 through 37 above.

38.    47 U.S.C. § 332(c)(7)(B)(i)(I) prohibits State and local governments from utilizing policies and procedures and from enacting regulations that "unreasonably discriminate among providers of functionally equivalent services."

39.    On February 7, 2008, the City denied ATC's request for a CUP on the grounds that the Border Facility does not comply with the Wireless Regulations. The City, acting in its proprietary capacity, leases space on city-owned telecommunication towers for commercial purposes in and around the City in direct competition with ATC. The City exempts its towers from its Wireless Regulations. Some of these towers are monopoles of the same general design as ATC's Border Facility and are not distinguishable from ATC's Border Facility in terms of the criteria which form the basis of the City's denial of ATC's CUP. The City has proffered no reasonable basis for differentiating these city facilities from ATC's facilities. Accordingly, the City's denial of the CUP unreasonably discriminates against ATC which provides functionally equivalent services to those provided by the City in making space available for lease on its towers for placement of commercial wireless antennas.

40.    Accordingly, the City's denials of ATC's CUP violates 47 U.S.C. §

11

332(c)(7)(B)(i)(I) and should be set aside on those grounds.

## COUNT II

### Violation of Section 332(c)(7)(B)(i)(II) of the Telecommunications Act

### (47 U.S.C. § 332(c)(7)(B)(i)(II))

41.    ATC incorporates herein by reference the allegations of paragraphs 1 through 41 above.

42.    47 U.S.C. § 332(c)(7)(B)(i)(II) provides that any regulation of personal wireless service facilities shall not "prohibit or have the effect of prohibiting the provision of personal wireless service."

43.    On February 7, 2008, the City denied ATC's request for a CUP, on the grounds that the facility does not comply with the Wireless Regulations. These facilities, as well as others, are existing facilities that comprise the backbone of ATC's carrier customers' network in the City of San Diego. Removal of this Border Facility will have a substantial impact on the carriers' networks, resulting in significant gaps in service where no such gaps currently exist. This is an existing site that has already been determined to comply with City requirements. No changes have occurred to this location in which this site resides that warrant replacement or relocation.

44.    The denial of ATC's request for a CUP to continue operation of the Border Facility, if upheld, will result in the creation of a significant gap in services for both Tenants utilizing the Border Facility, as shown by uncontroverted evidence in the record. Furthermore, the manner in which the existing facility currently fills that significant gap is the least intrusive on the values addressed by the applicable provisions of the City's Municipal Code. Furthermore, the least intrusive alternative test requires a special application in the context of this case. Where facilities have already been deployed in the formation of a complex wireless network, forced removal of these facilities solely on subjective and arbitrary aesthetic grounds, which removal would result in new gaps in services and the need for extensive network reconfiguration with new land use impacts, should constitute effective prohibition of services under §

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

12

1   332(c)(7)(B)(i)(II), and the City's denial should be set aside on those grounds.

2       45.     Accordingly the City's denial of ATC's CUP should be found in violation of 47

3   U.S.C. § 332(c)(7)(B)(i)(II) and set aside and the requested CUP should be granted.

4                                    **COUNT III**

5             **Violation of Section 332(c)(7)(B)(ii) of the Telecommunications Act**

6                          **(47 U.S.C. § 332(c)(7)(B)(ii))**

7       46.     ATC incorporates herein by reference the allegations of paragraphs 1 through 41

8   above.

9       47.     47 U.S.C. § 332(c)(7)(B)(ii) requires that  a local government "act on any request

10  for authorization to place, construct, or modify personal wireless service facilities within a

11  reasonable period of time after the request is duly filed with such government or instrumentality,

12  taking into account the nature and scope of such request."

13      48.     It has been more than two years since ATC applied for a Planned Development

14  Permit for the Border Facility.  Despite numerous hearings and decisions by both the City's

15  Hearing Officer and the Planning Commission on ATC's application for a CUP, the City has not

16  made any decision on ATC's request for a Planned Development Permit.  This delay violates the

17  provisions of the Permit Streamlining Act and is unreasonable.

18      49.     Accordingly the City's failure to approve ATC's Planned Development Permit

19  should be found to be in violation of 47 U.S.C. § 332(c)(7)(B)(ii), and the Court should order the

20  City to issue the requested Planned Development Permit.

21                                   **COUNT IV**

22            **Violation of Section 332(c)(7)(B)(iii) of the Telecommunications Act**

23                         **(47 U.S.C. § 332(c)(7)(B)(iii))**

24      51.     ATC incorporates herein by reference the allegations of paragraphs 1 through 46

25  above.

26      52.     47 U.S.C. § 332(c)(7)(B)(iii) requires that any decision by a State or local

27  government to deny a request to place, construct, or modify personal wireless service facilities

28                                         13

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA  90802

shall be in writing and supported by substantial evidence...."

53.     On February 7, 2008, the City finally denied ATC's request for a CUP. However, this decision was based on conclusory findings which were not supported by substantial evidence in the record. The decision of the Planning Commission was also tainted by staff's insistence on requirements related to the CUP application that were unlawful in light of the City's failure to comply with the Permit Streamlining Act. Furthermore, the Planning Commission, in making its decision, failed to follow the applicable requirements of the City's Land Development Code. For example, the Planning Commission's findings state: "Since 2000, the City has had a Communication Antenna ordinance that requires architectural or environmental integration with the project site." This appears to be a reference to the definitional provision in Section 141.0405(e)(1) of the Land Development Code referred to in paragraph 17 above: "An antenna facility will be considered a minor telecommunication facility if the facility, including equipment and structures, is concealed from public view or integrated into the architecture or surrounding environment through architectural enhancement (enhancements that complement the scale, texture, color, and style), unique design solutions, or accessory use structures." However, the Border Facility was processed by the City not as a "minor telecommunication facility," but rather as a "major telecommunication facility." The findings also state that "[t]he intent of the regulations is to camouflage facilities from public view." While this may be true of the regulations governing minor telecommunication facilities, it is not the standard found in the Land Development Code for major telecommunication facilities.

54.     In addition, the Planning Commission failed to consider the qualification found in the required findings for issuance of a CUP that the development need only comply with the regulations of the Land Development Code "to the maximum extent feasible." Land Development Code § 126.0305(c). The record contains no evidence of any analysis (other than speculation) by the Planning Commission or the City's staff of whether it was "feasible" to comply with the requirements of the Land Development Code to any greater extent than the facility already did, and the City ignored expert testimony that it was not feasible to do so. It also

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

14

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

failed to even consider the applicability of the Land Development Code's provisions regarding Planned Development Permits, which, as indicated above, provide flexibility to avoid "strict application of the base zone development regulations."

55.    The discussion under each of the requisite "Findings" attached to Resolution No. 4366-PC as adopted by the Planning Commission, in several instances, does not even evidence a reasoned consideration of relevant issues. In the face of the previous findings on largely identical issues by the City Council in support of the Original CUP for the Border Facility, and the vote of the local Community Planning Group to support ATC's application with only the modifications proposed by ATC, the record does not provide substantial evidence to support the Planning Commission's denial.

56.    In addition, the record does not even establish that the document transmitted by Karen Lynch-Ashcraft was ever adopted by the Planning Commission since the resolution is not signed by a member of the Planning Commission and the motion on which the Planning Commission voted at its February 7, 2008 hearing made no reference to such findings. The motion approved by the Planning Commission was to uphold the decision of the Hearing Officer, which was based on different findings. (The Hearing Officer explicitly made three of the required four findings but also failed to consider the "to the maximum extent feasible" qualification of the fourth.) The City's denial was based on the wholly subjective and arbitrary aesthetic criteria of City staff. Accordingly, the City's denial of ATC's CUPs and Site Development Permit are not supported by substantial evidence contained in a written record.

57. Accordingly, the City's actions should be found in violation of 47 U.S.C. § 332 (c)(7)(B)(iii) and set aside and the requested permits should be granted.

<u>**COUNT V**</u>

**Mandamus**

**(Inherent Authority or Cal. Code Civ. Pro. § 1094.5)**

58.    ATC incorporates herein by reference the allegations of paragraphs 1 through 53 above.

15

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

59.    ATC brings the Count for Mandamus pursuant to the Court's inherent authority under the federal Communications Act, or, in the alternative, Cal. Code of Civ. Pro. § 1094.5. In either event, this court has jurisdiction to hear this claim under 28 U.S.C. §§ 1331 and 1332, and under the supplemental jurisdiction conferred by 28 U.S.C. § 1367(a).

60.    The City, in denying ATC's CUP, has violated federal law as set forth in this Complaint. The City therefore is under a mandatory duty to issue a CUP to permit ATC to continue to maintain and operate the Border Facility.

61.    ATC is beneficially interested in the issuance of a writ of mandamus. As the applicant for the CUP at issue, ATC's rights and interests have been and will be adversely affected, and the full use and enjoyment of its property will be denied, unless the City is compelled by the Court to issue a CUP to permit ATC to continue to maintain and operate the Border Facility.

62.    ATC respectfully requests that the Court issue a writ of mandamus pursuant to its inherent authority under the federal Communications Act, or, in the alternative § 1094.5, compelling the City thereby to issue a CUP to permit ATC to continue to maintain and operate the Border Facility.

## COUNT VI

### Violation of Equal Protection under the Fourteenth Amendment
### to the Constitution of the United States
### (U.S. Const. amend. XIV)

63.    ATC incorporates herein by reference the allegations of paragraphs 1 through 53 above.

64.    Amendment XIV to the United States Constitution provides, in pertinent part, that no State shall "deprive a person of life, liberty, or property, without due process of law, nor deny any person within its jurisdiction the equal protection of the laws." Thus, ATC is entitled to the equal protection of the laws, and to be free from discrimination in statutory classifications and other governmental activities.

16

65.    The City's commercial activities related to the leasing of space on its telecommunications towers for third-party commercial antennas, as indicated above, is directly competitive and indistinguishable on any rational basis from the commercial activities in which ATC utilizes the Border Facility.

66.    However, the City, acting in an arbitrary and capricious manner, has imposed requirements on ATC in the conduct of its commercial activities from which the City has exempted itself.

67.    The allegations set forth above demonstrate that the City has violated NewPath's equal protection rights by imposing requirements upon and taking or failing to take action with respect to NewPath which it has not imposed on or taken or failed to take with respect to the City's own telecommunications towers, even when such towers are being utilized in a proprietary, nongovernmental capacity. There is no rational basis for the City's distinction between the City's towers and activities and those of ATC. The City's imposition of special requirements and its denial of permits necessary for ATC to continuing to operate the Border Facility constitutes a denial of ATC's right to equal protection of the laws in violation of the Fourteenth Amendment of the United States Constitution.

68.    Accordingly, the City's action should be declared to be a denial of ATC's rights to equal protection, and should be set aside and enjoined by the Court on that basis. Further, the Court should issue an order commanding the City to grant an appropriate permit so that ATC may continue to maintain and operate the Border Facility.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

1.    Under Count I, that the Court issue an Order declaring that the City's denial of ATC's CUP constitutes unreasonable discrimination under 47 U.S.C. § 332(c)(7)(B)(i)(I) and, therefore, is void, invalid, and unenforceable;

2.    Under Count II, that the Court issue an Order declaring that the City's denial of ATC's CUP constitutes actual or effective prohibition under 47 U.S.C. § 332(c)(7)(B)(i)(II) and,

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

17

therefore, is void, invalid, and unenforceable;

3.    Under Count III, that the Court issue an Order declaring the City has failed to act on ATC's request for a Planned Development Permit within a reasonable period of time in violation of 47 U.S.C. § 332(c)(7)(B)(ii);

4.    Under Count IV, that the Court issue an Order declaring that the City's denial of ATC's CUP is not supported by substantial evidence in a written record as required by 47 U.S.C. § 332(c)(7)(B)(iii) and, therefore, is void, invalid, and unenforceable;

5.    Under Count V, that the Court issue a writ of mandamus pursuant to its inherent authority under the federal Communications Act, or in the alternative, under Cal. Code. Civ. Pro. § 1094.5 ordering the City to grant ATC its requested CUP and/or such other permit or permits as may be necessary for the continued maintenance and operation of the Border Facility;

6.    Under Count VI, that the Court issue an Order declaring that the City's differential treatment of ATC's towers and those of the City utilized by it in competition with ATC is violative of ATC's rights to equal protection under the Fourteenth Amendment to the U.S. Constitution;

7.    For costs of suit;

8.    For damages in an amount to be established by the evidence;

9.    For attorneys' fees (including expert fees) in accordance with the provisions of 42 U.S.C. § 1988 and as may be otherwise provided by law for the violation of ATC's rights, privileges and immunities; and

10.    For such other and further relief as the court may deem just and proper.

Respectfully submitted,

Dated: March 7, 2008                    **CHANNEL LAW GROUP, LLP**

Julian Quattlebaum
*Attorney for Plaintiff*
*American Tower Corporation*

18

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

## EXHIBIT LIST

| Number | Exhibit | Page |
|--------|---------|------|
| 1 | Conditional Use Permit No. 94-0548……………………………… | 20 |
| 2 | Resolution No. R-286390…………………..……………........... | 33 |
| 3 | Site Justification Letter …………..………………………...… | 38 |
| 4 | Letter dated February 7, 2008 from Karen Lynch-Ashcraft | |
| | to Jim Kelly with unsigned Planning Commission | |
| | Resolution No. 4366-PC…………………………………….... | 43 |
| 5 | Letter dated March 3, 2006 from Robert Jystad to | |
| | James Waring re ATC CUP Renewals …..………………….… | 49 |
| 6 | City of San Diego Land Development Code § 141.0405 | |
| | as it was in effect prior to April 11, 2007…………………..…….. | 56 |
| 7 | Letter dated January 19, 2006 from Karen Lynch-Ashcraft | |
| | to Doug Kearney and Cycle Issues Report………………..…….. | 64 |

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

# Exhibit 1

Exhibit 1
Page 20 of 80

RECORDING REQUESTED BY
CITY OF SAN DIEGO
DEVELOPMENT SERVICES DEPARTMENT

AND WHEN RECORDED MAIL TO
PERMIT INTAKE
MAIL STATION 501

SPACE ABOVE THIS LINE FOR RECORDER'S USE

CONDITIONAL USE PERMIT NO. 94-0548
NEXTEL - SAN DIEGO BORDER COMMUNICATIONS FACILITY

CITY COUNCIL

This conditional use permit is granted by the City Council of the City of San Diego to SAN YSIDRO SCHOOL DISTRICT, Owner, NEXTEL COMMUNICATIONS, INC., Permittee, pursuant to Section 101.0510 of the Municipal Code of the City of San Diego.

1. Permission is granted to Owner/Permittee to construct an 800-square-foot unmanned dispatch mobile radio communication facility, located on San Ysidro School District property at 4350 Otay Mesa Road, also described as a portion of Section 36, Township 18 South, Range 2 West, San Bernardino Meridian, in the City of San Diego, County of San Diego, State of California, in the R1-5000 zone.

2. The facility shall consist of the following:

   a. A 90-foot-high monopole with up to 12 vertical panel antennas and three 16-foot-high whip antennas mounted on the monopole, not to exceed a maximum height of 106 feet;

   b. An 800-square-foot chainlink fence enclosure;

   c. A two hundred-square-foot equipment shelter;

   d. Off-street parking to be located outside the fence on the existing paved parking lot that services the school district maintenance facility;

   e. Landscaping around the perimeter of the fenced enclosure;

   f. Accessory uses as may be determined incidental and approved by the Planning Commission.

3. One parking space shall be provided at the maintenance yard facility.

Exhibit _1_
Page _21_ of _30_

-PAGE 1 OF 5-

YOUR COPY

DO NOT RECORD

4.  No permit for construction of any facility shall be granted
    nor shall any activity authorized by this permit be
    conducted on the premises until:

    a.  The Permittee signs and returns the permit to the
        Development Services Department, Development and
        Environmental Planning (DEP) Division;

    b.  The conditional use permit is recorded by the
        Development Services Department in the office of the
        County Recorder.

5.  Before issuance of any building permits, complete grading
    and building plans shall be submitted to the Development
    Services Director for approval.  Plans shall be in
    substantial conformance to Exhibit "A," dated October 3,
    1995, on file in the office of the Development Services
    Department, DEP Division.  No change, modifications or
    alterations shall be made unless substantial conformance
    review or amendment of this permit shall have been granted.

6.  Prior to the issuance of any building permits, the
    applicant shall:

    a.  Ensure that building address numbers are visible and
        legible from the street (Uniform Fire Code ("UFC")
        § 10.208).

    b.  Show the location of all fire hydrants on the plot plan
        (UFC § 10.301).

7.  Before issuance of any grading or building permits, a
    complete landscape plan, including a temporary irrigation
    system, shall be submitted to the Development Services
    Director for approval.  The plans shall be in substantial
    conformance to Exhibit "A," dated October 3, 1995, on file
    in the office of the Development Services Department.
    Approved planting shall be installed before issuance of any
    occupancy permit on any building.  Such planting shall not
    be modified or altered unless this permit has been amended
    and is to be maintained in a disease, weed and litter free
    condition at all times.

8.  If and/or when Otay Mesa Road is improved, Nextel
    Communications, Inc. shall be responsible for providing
    street trees along the project's street frontage as shown on
    Exhibit "A," dated October 3, 1995.  Seven 36-inch box trees
    or eighteen 24-inch box trees shall be provided.  The type
    of tree shall be to the satisfaction of the Development
    Services Director.  The trees shall be permanently irrigated
    in accordance with the City of San Diego Landscape Technical
    Manual.

Exhibit 1
Page 22 of 80

YOUR COPY

DO NOT RECORD

9.   If any work is proposed within the Caltrans right-of-way, an encroachment permit will be required from the Caltrans Permit Office.

10.  This conditional use permit must be used within 36 months after the date of City approval or the permit shall be void. An Extension of Time may be granted as set forth in Section 111.1122 of the Municipal Code. Any extension of time shall be subject to all standards and criteria in effect at the time the extension is applied for.

11.  Construction and operation of the approved use shall comply at all times with the regulations of this or any other governmental agencies.

12.  After establishment of the project, the property shall not be used for any other purposes unless:

   a.   Authorized by the Planning Commission; or

   b.   The proposed use meets every requirement of the zone existing for the property at the time of conversion; or

   c.   The permit has been revoked by the City.

13.  This conditional use permit shall expire ten years from the effective date of the approved permit, unless a new application for a conditional use permit is submitted to the Development Services Department, DEP Division 90 days in advance of the expiration date.

14.  Should the new permit application be denied by the Planning Commission, this permit will automatically expire 90 days from the date of action by the approving authority; and

   a.   The permittee shall cease and desist all activity on the site within that 90 days; and

   b.   The permittee shall return the site to original condition within 90 days from the date of action by the approving authority.

15.  This conditional use permit may be revoked by the City if there is a material breach or default in any of the conditions of this permit.

16.  This conditional use permit is a covenant running with the subject property and shall be binding upon the Permittee and any successor or successors, and the interests of any successor shall be subject to each and every condition set out in this permit and all referenced documents.

17.  All of the conditions contained in this permit have been considered and have been determined to be necessary in order

Exhibit __1__
Page 23 of 80



YOUR COPY

DO NOT RECORD

to make the findings required for this discretionary permit. It is the intent of the City that the holder of this permit be required to comply with each and every condition in order to be afforded special rights which the holder of the permit is obtaining as a result of this permit.  It is the intent of the City that the owner of the property which is the subject of this permit either utilize the property for any use allowed under the zoning and other restrictions which apply to the property or, in the alternative, that the owner of the property be allowed the special and extraordinary rights conveyed by this permit, but only if the owner complies with all the conditions of this permit.

In the event that any condition of this permit, on a legal challenge by the Owner/Permittee of this permit, is found or held by a court of competent jurisdiction to be invalid, unenforceable or unreasonable, this permit shall be void. However, in such event, the Owner/Permittee shall have the right, by paying applicable processing fees, to bring a request for a new permit without the "invalid" condition back to the discretionary body which approved the permit for a determination by that body as to whether all of the findings necessary for the issuance of the permit can still be made in the absence of the "invalid" condition(s).  Such hearing shall be a hearing de novo and the discretionary body shall have the absolute right to approve, disapprove or modify the proposed permit and the condition(s) contained therein.

18.  The issuance of this permit by the City of San Diego does not authorize the applicant for said permit to violate any Federal, State or City laws, ordinances, regulations or policies including, but not limited to, the Federal Endangered Species Act of 1973 and any amendments thereto (16 U.S.C. Section 1531 et seq.).

Passed and adopted by the City Council on October 3, 1995 by Resolution No. R-286390.

Exhibit 1
Page 24 of 80



DO NOT RECORD

AUTHENTICATED BY THE CITY MANAGER

By _____

The **undersigned Permittee**, by execution hereof, agrees to each and every condition of this permit and promises to perform each and every obligation of Permittee hereunder.

San Ysidro School District
Owner

By_____

NEXTEL COMMUNICATIONS, INC.
Permittee

By_____

NOTE: Notary acknowledgments must be attached per Civil Code Section 1180, et seq. Form=p.ack

Exhibit 1
Page 25 of 80

YOUR COPY

DO NOT RECORD

RECORDING REQUESTED BY
CITY OF SAN DIEGO
PLANNING & DEVELOPMENT REVIEW

AND WHEN RECORDED MAIL TO
PERMIT INTAKE
MAIL STATION 501

SPACE ABOVE THIS LINE FOR RECORDER'S USE

CONDITIONAL USE PERMIT NO. 94-0548
**TOWER ASSET, INC. BY SPECTRA SITE COMMUNICATIONS INC.**
**CORRECTED VERSION AUGUST 15, 2000**

This Conditional Use Permit, is granted by the City Council of the City of San Diego to SAN YSIDRO SCHOOL DISTRICT, Owner, TOWER ASSET, INC. BY SPECTRA SITE COMMUNICATIONS INC., Permittee pursuant to Section 101.0510 of the Municipal Code of the City of San Diego.

1.    Permission is granted to Owner/Permittee to construct an 800-square-foot unmanned dispatch mobile ratio communication facility, located on San Ysidro School District property at 4350 Otay Mesa Road, also described as a portion of Section 36, Township 18 south, Range 2 West, San Bernardino Meridian, in the City of San Diego, County of San Diego, State of California, in the R1-5000 Zone.

2.    The facility shall consist of the following:

    a.    A 90-foot-high monopole with up to 12 vertical panel antennas and three 16-foot-high whip antennas mounted on the monopole, not to exceed a maximum height of 106 feet;

    b.    An 800-square-foot chainlink fence enclosure;

    c.    A two hundred-square-foot equipment shelter;

    d.    Off-street parking to be located outside the fence on the existing paved parking lot that services the school district maintenance facility;

    e.    Landscaping around the perimeter of the fenced enclosure;

    f.    Accessory uses as may be determined incidental and approved by the Planning Commission.

- PAGE 1 of 5 -

SCANNED

ORIGINAL
Exhibit 1
Page 26 of 80

3.    One parking space shall be provided at the maintenance yard facility.

4.    No permit for construction of any facility shall be granted nor shall any activity authorized by this permit be conducted on the premises until:

    a.    The Permittee signs and returns the permit to the Planning and Development Review Department, Land Development Review (LDR) Division;

    b.    The Conditional Use Permit is recorded by the Planning and Development Review Department in the Office of the County Recorder.

5.    Before issuance of any building permits, complete grading and building plans shall be submitted to the Planning and Development Review Director for approval.  Plans shall be in substantial conformance to Exhibit "A," dated October 3, 1995, on file in the Office of the Planning and Development Review Department, LDR Division.  No change, modifications or alterations shall be made unless substantial conformance review or amendment of this permit shall have been granted.

6.    Prior to the issuance of any building permits, the applicant shall:

    a.    Ensure that building address numbers are visible and legible from the street (Uniform Fire Code ("UFC") § 10.208).

    b.    Show the location of all fire hydrants on the plot plan (UFC § 10.301).

7.    Before issuance of any grading or building permits, a complete landscape plan, including a temporary irrigation system, shall be submitted to the Planning and Development Review Director for approval.  The plans shall be in substantial conformance to Exhibit "A," dated October 3, 1995, on file in the Office of the Planning and Development Review Department. Approved planting shall be installed before issuance of any occupancy permit on any building.  Such planting shall not be modified or altered unless this permit has been amended and is to be maintained in a disease, weed and litter free condition at all times.

8.    If and/or when Otay Mesa road is improved, Nextel Communications, Inc. shall be responsible for providing street trees along the project's street frontage as shown on Exhibit "A," dated October 3, 1995.  Seven 36-inch box trees or eighteen 24-inch box trees shall be provided.  The type of tree

- PAGE 2 of 5 -

ORIGINAL

Exhibit 1
Page 27 of 80

shall be to the satisfaction of the Planning and Development Review Director. The trees shall be permanently irrigated in accordance with the City of San Diego *Landscape Technical Manual*.

9. If any work is proposed within the Caltrans right-of-way an encroachment permit will be required from the Caltrans permit Office.

10. This Conditional Use Permit must be used within 36 months after the date of City approval or the permit shall be void. An Extension of Time may be granted as set forth in Section 111.1122 of the Municipal Code. Any Extension of Time shall be subject to all standards and criteria in effect at the time the extension is applied for.

11. Construction, and operation of the approved use shall comply at all times with the regulations of this or any other governmental agencies.

12. After establishment of the project, the property shall not be used for any other purposes unless:

    a.    Authorized by the Planning Commission, or

    b.    The proposed use meets every requirement of the zone existing for the property at the time of conversion; or

    c.    The permit has been revoked by the City.

13. This Conditional Use Permit shall expire ten years from the effective date of the approved permit, unless a new application for a Conditional Use Permit is submitted to the Planning and Development Review Department, LDR Division 90 days in advance of the expiration date.

14. Should the new permit application be denied by the Planning Commission, this permit will automatically expire 90 days from the date of action by the approving authority; and

    a.    The Permittee shall cease and desist all activity on the site within that 90 days; and

    b.    The Permittee shall return the site to original conditions within 90 days from the date of action by the approving authority.

15. This Conditional Use Permit may be revoked by the City if there is a material breach or default in any of the conditions of this permit.

- PAGE 3 of 5 -

ORIGINAL

Exhibit ___1___
Page ___28___ of ___80___

16.  This Conditional Use Permit is a covenant running with the subject property and shall be binding upon the Permittee and any successor or successors, and the interests of any successor shall be subject to each and every condition set out in this permit and all referenced documents.

17.  All of the conditions contained in this permit have been considered and have been determined to be necessary in order to make the findings required for this discretionary permit.  It is the intent of the City that the holder of this permit be required to comply with each and every condition in order to be afforded special rights which the holder of the permit is obtaining as a result of this permit.  It is the intent of the City that the owner of the property which is the subject of this permit either utilize the property for any use allowed under the zoning and other restrictions which apply to the property or, in the alternative, that the owner of the property be allowed the special and extraordinary rights conveyed by this permit, but only if the owner complies with all the conditions of this permit.

18.  The issuance of this permit by the City of San Diego does not authorize the applicant for said permit to violate any Federal, State or City laws, ordinances, regulations or policies including, but not limited to, the Federal Endangered Species Act of 1973 and any amendments thereto (16 U.S.C. Section 1531 et seq.).

Passed and adopted by the City Council on October 3, 1995 by Resolution No. R-286390.

- PAGE 4 of 5 -

ORIGINAL

Exhibit _1_
Page _19_ of _80_

AUTHENTICATED BY THE CITY MANAGER

By_____

The **undersigned Permittee**, by execution hereof, agrees to each and every condition of this permit and promises to perform each and every obligation of Permittee hereunder.

San Ysidro School District
Owner

By_____

TOWER ASSET, INC. BY SPECTRASITE
COMMUNICATIONS, INC.
Permittee

By_____
ANDREW H. CHRISTIAN, JR.
Director, Collocation Operations

**NOTE: Notary acknowledgments
must be attached per Civil
Code Section 1180, et seq.
Form=p.ack**

- PAGE 5 of 5 -

ORIGINAL

Exhibit 1
Page 30 of 80



FIRST AMERICAN

STATE OF CALIFORNIA }
COUNTY OF _____ SAN DIEGO _____ }ss.


On _September 8, 2000_____, before me, ___Alice F. Perez, Notary Public_____ ,
personally appeared _____JACK N. GOAD_____

_____, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.


WITNESS my hand and official seal.

Signature _____

ALICE F. PEREZ
Commission # 1247444
Notary Public - California
San Diego County
My Comm. Expires Jan 24, 2004


(This area for official notarial seal)

| | |
|---|---|
| Title of Document | Conditional Use Permit No. 94-0548 |
| Date of Document | Version August 15, 2000   No. of Pages  5 |
| Other signatures not acknowledged | Andrew H. Christian Jr. |

3008 (1/94) (General)
First American Title Insurance Company

Exhibit _1_
Page _31_ of _80_

**NORTH CAROLINA, WAKE COUNTY**

I, a Notary Public of the County and State aforesaid, certify that **ANDREW H. CHRISTIAN, JR** personally appeared before me this day and acknowledged the execution of the foregoing instrument: **CONDITIONAL USE PERMIT NO. 94-0548 (TOWR ASSET, INC. BY SPECTRA SITE COMMUNICATIONS INC. CORRECTED VERSION AUGUST 15, 2000).** Witness my hand and official stamp or seal, this 6th day of September, 2000.

My commission expires:                    _____Notary Public
    1-13-04                          **Holly D. Bender**

**SEAL-STAMP:**



Exhibit 1
Page 32 of 80

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Channel Law Group, LLP
100 Oceangate. Suite 1400
Long Beach. CA 90802

# Exhibit 2

Exhibit 2
Page 33 of 80

(R-96-381)

RESOLUTION NUMBER R-286390

ADOPTED ON OCTOBER 3, 1995

WHEREAS, on September 15, 1994, SAN YSIDRO SCHOOL DISTRICT, Owner, and NEXTEL COMMUNICATIONS, INC., Permittee, filed an application for a conditional use permit to construct and operate an 800-square-foot unmanned dispatch mobile radio communication facility located at 4350 Otay Mesa Road, also described as a portion of Section 36, Township 18 South, Range 2 West, San Bernardino Meridian, in the City of San Diego, County of San Diego, State of California, in the R1-5000 zone; and

WHEREAS, on June 1, 1995, Phillip D. Taylor and Bruce Tabb filed an appeal of the Planning Commission's decision for reasons cited as inadequate environmental review and visual impacts; and

WHEREAS, on October 3, 1995, the Council of The City of San Diego considered the appeal of Philip D. Taylor and Bruce Tabb and considered Conditional Use Permit No. 94-0548, pursuant to Section 101.0510 of the Municipal Code of the City of San Diego; and NOW, THEREFORE,

BE IT RESOLVED, by the Council of The City of San Diego, that this Council adopts the following findings with respect to Conditional Use Permit No. 94-0548:

1.   The proposed use will fulfill an individual and community need and will not adversely affect the General Plan or the Community Plan.

The project site is designated for low density residential development by the General Plan and the San Ysidro Community

-PAGE 1 OF 3-

YOUR COPY

DO NOT RECORD 2

Exhibit ___
Page 34 of 80

Plan. Nevertheless, particular uses which fulfill individual and community needs are permitted in residential and other zones by Conditional Use Permit. This project will not adversely impact the General Plan nor the San Ysidro Community Plan. Perimeter landscaping and neutral colors on exterior surfaces will effectively screen the facility and allow the fence, equipment building and monopole to blend with surrounding vistas.

2. **The proposed use, because of conditions that have been applied to it, will not be detrimental to the health, safety and general welfare of persons residing or working in the area and will not adversely affect other property in the vicinity.**

Radio frequency energy transmission from the proposed whip antennas and panels would not result in significant health and safety risks to the surrounding area. The transmissions would have a maximum of 6.50 microwatts per square centimeter, well below the accepted safety standard of 567 microwatts per square centimeter established by the American National Standards Institute and the National Council on Radiation Protection.

3. **The proposed use will comply with the relevant regulations in the Municipal Code.**

The proposed facility and the existing school district facility comply with the relevant regulations in the Municipal Code. Landscape screening will be provided. One of the existing parking spaces will be designated for use by Nextel and will meet the parking requirement for this project.

The above findings are supported by the minutes, maps and exhibits, all of which are herein incorporated by reference.

-PAGE 2 OF 3-


YOUR COPY

DO NOT RECORD

Exhibit 2
Page 35 of 80

BE IT FURTHER RESOLVED, that the Council hereby grants the appeal of Bruce Tabb and Philip Taylor from the decision of the Planning Commission in approving Conditional Use Permit No. 94-0548 for the NEXTEL-San Diego Border Communication Facility.

BE IT FURTHER RESOLVED, that the Council does hereby amend the terms of the subject conditional use permit as follows: that after one year staff is to return to Council with a report on the status of the negotiations for a different site and. In all other aspects the actions of the Planning Commission were and are sustained and Conditional Use Permit No. 94-0548 is hereby granted to SAN YSIDRO SCHOOL DISTRICT, Owner, NEXTEL COMMUNICATIONS, INC., Permittee, under the terms and conditions set forth in the permit attached hereto and made a part hereof.

APPROVED:   JOHN W. WITT, City Attorney

By _____
     John K. Riess
     Senior Deputy City Attorney

JKR:pev
10/11/95
Or.Dept:Clerk
R-96-381
Form=r.permit

-PAGE 3 OF 3-



DO NOT RECORD

Exhibit 2
Page 36 of 80

Passed and adopted by the Council of San Diego on

OCT 03 1995

by the following vote:

YEAS: Mathis, Harvey, Kehoe, Stevens, Warden, Stallings, McCarty, Vargas.

NAYS: None.

NOT PRESENT: Mayor Golding.

AUTHENTICATED BY:

SUSAN GOLDING
Mayor of The City of San Diego, California

CHARLES G. ABDELNOUR
City Clerk of The City of San Diego, California

(Seal)

By: _____MARY CEPEDA_____, Deputy

I HEREBY CERTIFY that the above and foregoing is a full, true and correct copy of RESOLUTION NO. R- 286390 , passed and adopted by the Council of The City of San Diego, California on OCT 03 1995 .

CHARLES G. ABDELNOUR
City Clerk of The City of San Diego, California

(SEAL)

By: _____*Mary Cepeda*_____, Deputy

YOUR COPY

DO NOT RECORD

Exhibit 2
Page 37 of 80

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

# Exhibit 3

Exhibit 3
Page 38 of 80



## *Site Justification Letter*

| | |
|---|---|
| *Location:* | 4350 Otay Mesa Road |
| *Zone:* | R1-5000 Zone |
| *APN:* | 638-070-69 |
| *American Tower/SpectraSite Number* | 302252/CA-5129 |
| *Conditional Use Permit #* | CUP No. 94-0548 |
| *Permit Expiration Date* | 10/3/05 |
| *Contacts* | Robert Jystad, Esq. |
| | Tel: 310-209-8515; Fax 310-984-5132 |
| | rjystad@sbcglobal.net |
| | James Kelly |
| | Tel: 949-442-6407; Fax: (949) 474-7260 |
| | James.Kelly@americantower.com |
| | Doug Kearney |
| | Tel: 949-442-6407; Fax: (949) 474-7260 |
| | Doug.Kearney@americantower.com |

American Tower Corporation requests that the City of San Diego either extend the original Conditional Use Permit, or in the alternative, approve a new Planned Development Permit, consistent with the original Conditions of Approval under Conditional Use Permit Number 94-0548 *(please refer to attached, original CUP)* to continue to operate, and maintain a wireless communication facility at 4350 Otay Mesa Road. The existing communications facility consists of a 90-foot monopole with nine (9) Sprint Nextel panel antennas and three (3) 16-foot omni-directional antennas mounted at a height of 90 feet and 12 Cingular antennas mounted at a height of 75 feet. Two equipment shelters are located at the base of the pole within the lease area. No additional active equipment or antennas have been added to the existing facility. American Tower is requesting the extension and the Planned Development Permit in order that Lessees, Cingular and Nextel, can continue to provide uninterrupted and seamless wireless service to their customers.

### *Planning/Zoning Consistency*

As an initial matter, it would be reasonable and appropriate for the City to treat this application as a request for an extension of the existing CUP. The original 10-year CUP was issued on Oct. 3, 1995 and the facility has continued to exist without controversy since it was first approved. American Tower and SpectraSite merged this past year and challenges associated with the consolidation of these two large companies resulted in a backlog of tasks including the renewal of this CUP. On its own initiative, American Tower met with the City to discuss the renewal of this and other CUPs in July 2005.

1

American Tower Corporation<br>2201 Dupont Drive, Suite 340<br>Irvine, CA 92612

Exhibit 3
Page 39 of 80

American Tower has met with and has maintained contact with the City throughout the past few months and has expedited its own internal processes in order to file this application in a timely manner consistent with the requests of City staff.

If the City is willing to treat this request as a request for an extension, then, according to San Diego Mun. Code § 126.0111, CUP No. 94-0548 could be extended up to three years on the basis of the following findings:

> (1) *This project as originally approved would not place the occupants of the proposed development or the immediate community in a condition dangerous to their health or safety.*

The facility poses no danger to the occupants of the property or to the community. Arguably, its removal poses a threat both to the area residents and to the traffic on Highways 805 and 905 by creating a gap in the provision of wireless communication services in a area where traffic related emergencies are routine. The site meets all applicable Building and Electrical Code requirements and complies with all state and federal regulations, including the FCC's maximum permitted exposure (MPE) requirements.

> (2) *No new condition is required to comply with state or federal law.*

American Tower is not aware of any changes to state or federal law that would require the City to impose additional conditions on the facility.

Other than the fact that the CUP expired before being renewed, neither SpectraSIte nor American Tower, nor the Lessees Sprint Nextel and Cingular, violated any conditions of the CUP.

In the event that the City requires American Tower to obtain a new Planned Development Permit for this facility, that permit could be issued on the basis of the findings identified in San Diego Mun. Code §§ 126.0604 (Planned Development Permit). In providing the following information, American Tower notes that existing law governing the zoning of wireless telecommunications facilities does not permit the City to exercise unfettered discretion in its determination that a particular facility meets the City's existing zoning requirements. *Sprint Telephony PCS, LP v. County of San Diego*, 377 F.Supp.2d 886 (S.D. Cal. 2005) *motion for recon. denied* (enjoining enforcement of the County wireless telecommunications ordinance and applicable zoning code requirements on wireless telecommunications facilities on the basis of federal preemption). Accordingly, American Tower offers the following information to facilitate the City's review of this application, but in doing so reserves all rights and does not waive any right to any claim or defense, including federal preemption.

**Findings Required for a Planned Development Permit**

American Tower is requesting the City to permit the continued use of a communications facility that has been operational for over ten years and continuously serving the City of San Diego's vital public and private communications needs. Wireless networks are

2

Exhibit 3
Page 40 of 80

unusual in that there are significant height and location requirements that must be met to ensure their proper and effective use.

The City can permit this communications facility at its present height and location with a Planned Development Permit, subject to the following findings:

> *(1) The proposed development will not adversely affect the applicable land use plan.*

The facility has existed on this site for ten years without controversy. The location, size, design, and operating characteristics of the existing communications facility does not create noise, traffic, or other conditions that may be objectionable, detrimental or incompatible with other permitted uses in the vicinity.

- The facility is located within the San Ysidro School District maintenance yard overlooking Interstate 805 and the California border with Mexico to the South.
- The equipment associated with the facility operates virtually noise-free.
- The equipment does not emit fumes, smoke, dust, or odors that could be considered objectionable.
- The communications facility is unmanned and requires only periodic maintenance.

> *(2) The proposed development will not be detrimental to the public health safety and welfare.*

The existing communications facility has not created conditions or circumstances contrary to the public health, safety, and the general welfare, in that:

- The existing pole provides co-location, reducing the need for other wireless facilities in the area.
- Wireless communications service a critical need in the event of public emergency, including traffic accidents and other freeway incidents.
- Advanced wireless technologies are a use now required local businesses, homes, and schools.
- Digital wireless systems are an economical alternative to wired networks.
- All American Tower facilities operate in full compliance with the regulations and licensing requirements of the FCC, FAA, and CPUC.

> *(3) The proposed development will comply with the applicable regulations of the Land Development Code.*

The communications facility complies with the applicable regulations of the Land Development Code. It was permitted with a Conditional Use Permit in its current location and at its current height. American Tower is proposing no modifications to the communications facility that would alter this finding.

> *(4) The proposed development, when considered as a whole, will be beneficial to the community.*

3

American Tower Corporation
2201 Dupont Drive, Suite 340
Irvine, CA 92612


Exhibit 3
Page 41 of 80

The proposed facility will benefit the community because it will continue to allow commuters, businesses, and residents within the coverage area wireless access to the rapidly expanding communication infrastructure and to voice and data transmission services not currently available.

> (5) *Any proposed deviations pursuant to § 126.0602(b)(2) are appropriate for this location and will result in a more desirable project than would be achieved if designed in strict conformance with the development regulations of the applicable zone.*

The communications facility is appropriately placed it is adjacent to two major commuter thoroughfares and is located within the San Ysidro School District Maintenance Yard. The monopole and antennas are painted sky blue and the equipment buildings are desert tan to blend with the surrounding area. The monopole is partially screened from view from I-805 by existing mature landscaping. Due to its location within the school district maintenance yard and the fact that there is a 50-foot-high power pole already located within the same maintenance yard, it was determined that the project would not significantly affect the visual qualify and character of the area.

Moreover, reduction in the height of the antennas on this structure to the zone 30-foot limitation will seriously impact the quality and scope of coverage provide by Sprint Nextel from this site. The project therefore is more desirable in its present configuration than it would be if the City strictly enforced the development regulations for this zone.

## Brief Overview of American Tower Corporation

American Tower Corporation (www.americantower.com) is the leading independent owner, operator and developer of broadcast and wireless communications sites in North America. American Tower owns and operates over 22,000 sites in the United States, Mexico, and Brazil. Additionally, American Tower manages approximately 2,000 revenue producing rooftop and tower sites. American Towers customers are leading wireless communications providers, including Cingular, Sprint Nextel and Verizon Wireless, radio and television broadcasters, and federal, state and local government agencies.

**4**

American Tower Corporation
2201 Dupont Drive, Suite 340
Irvine, CA 92612

Exhibit 3
Page 42 of 80

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

# Exhibit 4

Exhibit 4
Page 43 of 80



**THE CITY OF SAN DIEGO**

February 7, 2008

Jim Kelly
American Tower Corporation
2201 Dupont Drive, Suite 340
Irvine, CA 92612

Dear Mr. Kelly:

Subject:    American Tower - Border; Project No. 90476

This letter is to inform you that the above-referenced project is being closed out as a result of the Planning Commission's February 7, 2008 decision to deny the appeal and deny Conditional Use Permit No. 289980 and Site Development Permit No. 452372.

The deposit account for the project has been closed. In approximately 6-8 weeks, the financially responsible party for the deposit account will receive any remaining funds in the account, provided the account is not in deficit. In the event the account is in deficit, the financially responsible party will continue to receive account statements showing the negative balance due until payment is received.

Neighborhood Code Compliance will be informed of the expired Conditional Use Permit.

If you have any questions, I can be reached at (619) 446-5351 or via e-mail at klynchashcraft@sandiego.gov

Sincerely,

Karen Lynch-Ashcraft
Development Project Manager

Enclosures:
1.  Resolution

cc:    File

**Exhibit 4**
**Page 44 of 80**

PLANNING COMMISSION
RESOLUTION NO. 4366-PC
CONDITIONAL USE PERMIT NO. 289980
SITE DEVELOPMENT PERMIT NO. 452372
**AMERICAN TOWER – BORDER**
PROJECT NO. 90476

WHEREAS, San Ysidro School District, Owner and American Tower Corporation, Permittee, filed an application with the City of San Diego for a permit for a wireless communication facility (as described in and by reference to the approved Exhibits "A" and corresponding conditions of approval for the associated Conditional Use Permit No.289980 and Site Development Permit No. 452372, on portions of an 11.74 acre site;

WHEREAS, the project site is located at 4350 Otay Mesa Road in the RS-1-7 zone of the San Ysidro Community Plan;

WHEREAS, the project site is legally described as a Portion of Section 36, Township 18 south, Range 2 west, San Bernardino Meridian in the City of San Diego, County of San Diego, State of California;

WHEREAS, on August 1, 2007, the Hearing Officer continued this project to September 12, 2007, in order to obtain additional information from staff and the applicant;

WHEREAS, on September 12, 2007, the Hearing Officer of the City of San Diego reviewed, considered and denied Conditional Use Permit No. 289980 and Site Development Permit No. 452372, pursuant to the Land Development Code of the City of San Diego;

WHEREAS, on September 21, 2007, Julian Quattlebaum, of Channel Law Group, on behalf of American Tower Corporation, appealed the Hearing Officer's decision;

WHEREAS, on December 13, 2007, the Planning Commission of the City of San Diego, considered Conditional Use Permit No. 289980 and Site Development Permit No. 452372, and pursuant to the Land Development Code of the City of San Diego, continued the project until February 7, 2008 in order to give the applicant time to return with design options that complied with the Land Development Code;

WHEREAS, on February 7, 2008, the Planning Commission of the City of San Diego, reviewed, considered and denied Conditional Use Permit No. 289980 and Site Development Permit No. 452372, pursuant to the Land Development Code of the City of San Diego; NOW, THEREFORE,

BE IT RESOLVED by the Planning Commission of the City of San Diego as follows:

That the Planning Commission adopts the following written Findings, dated February 7, 2008.

Exhibit 4
Page 45 of 80

FINDINGS:

**Conditional Use Permit - Section 126.0305**

1.    **The proposed development will not adversely affect the applicable land use plan;**

This facility was originally approved by the City Council on October, 3, 1995. The Conditional Use Permit (CUP) included a ten year expiration. At the time of approval, the City did not have applicable regulations for these types of facilities so the City Council imposed a ten year limit in order to re-evaluate the project in light of new regulations and or policies that may be in effect. The project exists as it did after initial construction and the new owner, American Tower Corporation is now seeking to obtain another CUP to maintain the facility as is.

Neither the City of San Diego General Plan nor the San Ysidro Community Plan addresses wireless communication facilities as a specific land use.

2.    **The proposed development will not be detrimental to the public health, safety, and welfare;**

The Telecommunication Act of 1996 preempts local governments from regulating the "placement, construction and modification of wireless communication facilities on the basis of the environmental effects of Radio Frequency (RF) emission to the extent that such facilities comply with the Federal Communication Commission's (FCC) standards for such emissions." If the decision maker approves the existing facility, a condition will be included within the permit to require American Tower or their tenants to perform a cumulative model RF test and submit the finding in a report to the City of San Diego within 90 days of approval of the CUP.

3.    **The proposed development will comply to the maximum extent feasible with the regulations of the Land Development Code; and**

This facility was originally approved by the City Council on October 3, 1995. The Conditional Use Permit (CUP) included a ten year expiration. At the time of approval, the City did not have applicable regulations for these types of facilities so the City imposed a ten year time limit in order to re-evaluate the project in light of new regulations and or policies that may be in effect. The project exists as it did after initial construction and the new owner, American Tower Corporation is now seeking to obtain another CUP to maintain the facility as is.

Since 2000, the City has had a Communication Antenna ordinance that requires architectural or environmental integration with the project site. Pursuant to the San Diego Land Development Code, wireless communication facilities are permitted in all zones citywide with the appropriate permits. Wireless communication facilities are separately regulated uses, which have limitations or require compliance with conditions in order to minimize potential impacts. The intent of the regulations is to camouflage facilities from public view. In this case, the monopole is the tallest structure in and around the area in which it is located and as such, it has an incongruous effect on the community's landscape. It is situated prominently along Interstate-805, which serves as a major north south transportation corridor and it poses an unsightly visual impact for commuters



Exhibit 4
Page 46 of 80

that utilize this corridor. It is not designed to be minimally visible through the use of architecture, landscape architecture and siting solutions.

Section 141.0405 of the Land Development Code differentiates between minor and major telecommunication facilities. Minor telecommunication facilities include those that are concealed from public view or integrated into the architecture or surrounding environment through architectural enhancement (enhancements that complement the scale, texture, color and style) unique design solutions, or accessory use structures. Major telecommunication facilities are antenna facilities that do not meet the criteria for minor telecommunication facilities or they are located in residential zones containing residential uses. Similar to minor facilities, they also need to be designed to be minimally visible through the use of architecture, landscape architecture and siting solutions. The Border project does not conform to this code requirement. American Tower Corporation submitted the application for a Conditional Use Permit on December 2, 2005 and did not propose any modifications to the facility. No attempt to comply with the regulations was made by American Tower until the project was before the Planning Commission in 2008. At that point, an enhanced landscape plan was presented to address the landscape architecture requirement of the regulations, but nothing to address minimizing the visibility of the facility through architecture or siting solutions. As it exists, it is a significant visual impact along Interstate-805, which serves as a major transportation corridor through the city. Many commuters pass through this section of the city on a daily basis and are subjected to the unsightliness associated with this project.

Therefore, the project does not comply to the maximum extent feasible with the regulations of the Land Development Code.

4.    **The proposed use is appropriate at the proposed location.**

A wireless communication facility at this location is an appropriate use subject to compliance with the ordinances and policies that regulate these types of facilities. Due to the fact that the existing facility does not comply with current regulations and policies, this finding cannot be affirmed. A facility that better integrates into the property and takes into consideration the surroundings and the proximity to Interstate-805 would be more appropriately located on this property.

**Site Development Permit - Section 126.0504**

1.    **The proposed development will not adversely affect the applicable land use plan;**

This facility was originally approved by the City Council on October, 3, 1995. The Conditional Use Permit (CUP) included a ten year expiration. At the time of approval, the City did not have applicable regulations for these types of facilities so the City Council imposed a ten year limit in order to re-evaluate the project in light of new regulations and or policies that may be in effect. The project exists as it did after initial construction and the new owner, American Tower Corporation is now seeking to obtain another CUP to maintain the facility as is.

Neither the City of San Diego General Plan nor the San Ysidro Community Plan addresses wireless communication facilities as a specific land use.



Exhibit 4
Page 47 of 80


2.    **The proposed development will not be detrimental to the public health, safety, and welfare; and**

The Telecommunication Act of 1996 preempts local governments from regulating the "placement, construction and modification of wireless communication facilities on the basis of the environmental effects of Radio Frequency (RF) emission to the extent that such facilities comply with the Federal Communication Commission's (FCC) standards for such emissions." If the decision maker approves the existing facility, a condition will be included within the permit to require American Tower or their tenants to perform a cumulative model RF test and submit the finding in a report to the City of San Diego within 90 days of approval of the CUP.

3.    **The proposed development will comply with the applicable regulations of the Land Development Code.**

The monopole complies with all the development regulations of the RS-1-7 zone except for the height limit of 30 feet. The monopole is 90 feet high and is situated prominently alongside of Interstate-805. Development in the area is low in scale and in addition to the school district maintenance yard; uses include single unit residential uses, an elementary school and vacant land. The San Ysidro Planned District Ordinance requires an SDP in order to grant a deviation, but it also states that an SDP shall only be granted for the purpose of providing design flexibility which would result in a project that would benefit surrounding properties and the community. This project does not visually benefit the community as it is not designed to be minimally visible through the use of architecture, landscape architecture and siting solutions.

This project was originally constructed in the mid-1990's when Nextel was still developing their network. Typically, carriers initially built tall facilities, later filling in their networks with lower sights. A 30 foot high faux tree exists on this site and is owned by Sprint. Sprint and Nextel merged a couple of years ago, which would now allow the company to consider consolidating technologies at this site.

BE IT FURTHER RESOLVED that, based on the findings hereinbefore adopted by the Planning Commission, Conditional Use Permit No. 289980 and Site Development Permit No. 452372 is hereby DENIED by the Planning Commission.

---

Karen Lynch-Ashcraft
Development Project Manager
Development Services

Adopted on: February 7, 2008

Job Order No. 42-5670

**Exhibit** 4
**Page** 48 **of** 80

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 5

Exhibit 5
Page 41 of 80

# Law Office of Robert Jystad

*100 Oceangate, Suite 1400*
*Long Beach, CA 90802-4323*
*(310) 209-8515; (310) 216-5090 (fax)*
*rjystad@sbcglobal.net*

**By Facsimile and U.S. Mail**
*(619) 236-7228*

March 3, 2006

Mr. James Waring, Esq.
Deputy Chief Operating Officer,
 Land Use and Economic Development
Office of the Mayor
CITY OF SAN DIEGO
202 "C" Street, 11th Floor
San Diego, CA 92101

Re:    **American Tower CUP Renewals**

Dear Mr. Waring:

I am writing to you on behalf of American Tower Corporation ("ATC"). ATC participated in the telecommunications meeting that you and Ms. Kris Michell held on February 2, 2006. We appreciated the time you spent with us and your attention to our concerns about the Conditional Use Permit ("CUP") permitting process.

We recognize that wireless consultant Doug Sain is working with your office on this and other issues on behalf of several major wireless carriers. Unfortunately for us, time is running short and we are compelled to contact you directly. Last summer, American Tower was forthcoming with the City's Development Services Department ("DSD") about its need to renew a number of CUPs for several monopoles it owns and manages throughout the City. As you are aware, and as we discussed on Feb. 2, the City is not permitting ATC to file for the renewal of its CUPs. Rather, because the CUPs have expired, the City is requiring ATC to file applications for new permits, which in several cases require Planned Development Permits and/or Site Development Permits in addition to the CUPs. ATC coordinated with DSD on the submission of eight new CUP applications prior to the end of 2005 and we are in receipt DSD's assessment letters on most of those applications. The conclusions drawn in these letters are extremely troubling, and, as a result, we met on Tuesday, February 21, 2006, with Senior Planner Karen Lynch Ashcraft to discuss the City's demands. Ms. Lynch Ashcraft confirmed that if American Tower is not willing to meet the requirements outlined in the assessment letters, DSD staff will recommend denial of the permits.

I have listed below some examples of DSD's demands in the assessment letters. The demands are taken from assessment letters on two sites, but they are substantially similar to language in other assessment letters. The first site, Mission San Diego, is a small shelter constructed on a hillside overlooking Qualcomm stadium and Interstate 15. There is no

**Exhibit** 5
**Page** 50 of 80

Letter to: Mr. James Waring, Esq.
Date: March 3, 2006
Page 2

monopole. The antennas are affixed to small poles at the height of the shelter, about 15 feet. On February 15, 2006, ATC met with the Kearney Mesa Planning Group about this site. The Group recommended approval of the site AS IS by a vote of 10-0-1, noting that the site was hardly visible.

The second site, San Diego Border, is a 90' foot monopole located in a maintenance yard owned by the San Ysidro School District. The site overlooks Interstate 805 near the Mexican border. On February 21, 2006, ATC met with the San Ysidro Planning and Development Group, which unanimously approved the site AS IS on condition that ATC agree to paint the pole a light tan color to blend in with the adjacent hillside. One member stated: "I am certainly not going to require them to take it down."

The reasonableness of these two Community Planning Groups stands in stark contrast to the DSD assessment letters, which have drawn the following conclusions, among others:

1. [Mission San Diego]: "The location, above a busy transit corridor is *highly visible, creating a significant visual impact from all vantage points.* The Code requires that a facility be designed to minimize visual impacts by designing the facility so that it is *concealed from public view*..."

2. Mission San Diego requires a Site Development Permit unless "the project is redesigned to comply with the exemption criteria...pertaining to setbacks..." In order to meet the setback requirement, ATC will need to relocate the facility off the hillside and into the adjacent residential neighborhood.

3. [Mission San Diego]: "Understanding that the network was built around this facility, it should also be recognized that the Planning Commission imposed a 10-year restriction because it was intended that if there were a better design or technical option available at the end of the time limit, *the facility would be required to be removed.*"

4. [San Diego Border]: "The prominent location of this property does not lend itself to a 90-foot high monopole or to an institutional equipment shelter."

5. [San Diego Border]: "With the significant improvements that have been in both the design and technical disciplines, it is expected that this facility *will be replaced*..."

6. [San Diego Border]: "Since the original CUP is expired, this proposal is being reviewed against today's regulations and policies and therefore a *thorough technical analysis*...will be required."

7. [San Diego Border]: "A detailed site justification...will be required."

8. [San Diego Border]: "Understanding that the network was built around this facility, it should also be recognized that the Planning Commission imposed a 10-year restriction



Exhibit 5
Page 51 of 80

Letter to: Mr. James Waring, Esq.
Date: March 3, 2006
Page 3

because it was intended that if there were a better design or technical option available at the end of the time limit, *the pole would be required to be removed.*"

As we discussed on Feb. 2, if the City requires ATC to take these sites down, the carriers they support, including Verizon Wireless, Cingular Wireless and Sprint Nextel, will be forced to reconfigure their networks and to construct several additional sites. Moreover, if DSD is successful in having these sites removed, ATC faces a significant loss of property and will find itself effectively barred from providing services in the City. That said, we are encouraged that the City is willing to consider ATC as part of a solution to its public communications system needs at the Encanto Reservoir location. We will work with DSD and READ on a possible collocation solution on an ATC structure. We note that the City has requested a height of 110 feet for its antennas. We expect to be able to accommodate that request but there is an obvious inconsistency between that request and DSD's demand that ATC and its tenants reduce the height of antennas on its structures or face denial.

ATC cannot take this situation lightly and it is supported by several recent federal court rulings. From our perspective, DSD is taking liberty with the City's ordinances and policies on wireless telecommunications facilities in a manner that we believe is unfair and justifies the type of federal restrictions on local authority that have emerged in several pivotal telecommunications cases. For example, the City's policies and ordinances are substantially similar to San Diego County's wireless telecommunications ordinance that the Southern District permanently enjoined, though the injunction recently was stayed pending appeal. *Sprint Telephony PCS, L.P. v. County of San Diego*, 377 F. Supp. 2d 886 (S.D. Cal. 2005) (County's exercise of unfettered discretion over permits for wireless telecommunications facilities violated federal law). In *County of San Diego*, Sprint successfully argued that federal law (47 U.S.C. § 253) preempted the County's four-tiered application structure and applicable discretionary zoning requirements. Notably, the City's ordinance utilizes a similar four tiered structure.[1]

In finding that § 253 preempted the San Diego County WTO, *County of San Diego* relied heavily on *City of Auburn v. Qwest Corporation*, 260 F.3d 1160, 1175 (9th Cir. 2001) *cert. denied City of Tacoma v. Qwest Corp.*, 534 U.S. 1079 (2002) ("The preemption [of local authority] is **virtually absolute** and its purpose is clear—certain aspects of telecommunications regulation are uniquely the province of the federal government and Congress has narrowly circumscribed the role of state and local governments in this arena") (emphasis added) and *Qwest Communications Corp. v. City of Berkeley*, 146 F. Supp. 2d 1081, 1097-98 (N.D. Cal. 2001) (striking as preempted under § 253 a local ordinance that vested significant discretion to grant or deny permits "based on an open-ended set of criteria and requirements"). The Ninth Circuit recently upheld the *Berkeley* decision noting "We have interpreted this preemptive language to be clear and "virtually absolute" in restricting municipalities to a "very limited and proscribed role in the regulation of telecommunications." *Qwest Communs., Inc. v. City of Berkeley*, 2006 U.S. App. LEXIS 669 at *5-6 (9th Cir., filed Jan 6, 2006).

---

[1] We asked Ms. Lynch-Ashcraft if *County of San Diego* had any impact on DSD's process. She said it did not.

**Exhibit** 5
**Page** 52 of 80

Letter to: Mr. James Waring, Esq.
Date: March 3, 2006
Page 4

ATC looks forward to working with you and the City to address this problem. We are optimistic that there is a workable solution, but not without a substantial change in the DSD's approach to CUP renewals.

Please contact me at your earliest convenience to discuss this matter further. I can be reached at (310) 209-8515 or rjystad@sbcglobal.net.

Sincerely,

Robert Jystad, Esq.
*Attorney for American Tower*

c:     Elizabeth A. Hill, Esq., American Tower Corporation

Exhibit 5
Page 53 of 80



# Law Office of Robert Jystad

100 Oceangate, Suite 1400
Long Beach, CA 90802-4323
(310) 209-8515; (310) 984-5132 (fax)
rjystad@sbcglobal.net

# FAX COVERSHEET

| To:  James Waring<br>       City of San Diego | From: Robert Jystad, Esq.<br>       Attorney for American Tower Corp. |
|---|---|
| Fax:  619-236-7228 | Fax:  562-216-5090 |
| Date: March 3, 2006 | Phone:  310-209-8515 |
| No. of pages (including cover): 5 | Re:  American Tower CUP Renewals |

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

If there are problems in the reception of this facsimile transmission, please contact Robert Jystad at 310-209-8515. This facsimile transmission may contain confidential or privileged information. If you believe that you have received the transmission in error, please notify the sender immediately and discard the transmission without copying or disclosing it.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

**Exhibit** 5
**Page** 54 **of** 80

TRANSMISSION VERIFICATION REPORT

```
                                      TIME  : 03/03/2006 16:50
                                      NAME  : LAW_OFFICE
                                      FAX   : 15622165090
                                      TEL   : 13109845137
                                      SER.# : 000L5J270442
```

```
DATE,TIME          03/03  16:48
FAX NO./NAME       916192367228
DURATION           00:01:37
PAGE(S)            05
RESULT             OK
MODE               STANDARD
                   ECM
```

## Law Office of Robert Jystad

100 Oceangate, Suite 1400
Long Beach, CA 90802-4323
(310) 209-8515; (310) 984-5132 (fax)
rjystad@sbcglobal.net

# FAX COVERSHEET

| To: James Waring<br>    City of San Diego | From: Robert Jystad, Esq.<br>    Attorney for American Tower Corp. |
|---|---|
| Fax:  619-236-7228 | Fax: 562-216-5090 |
| Date: March 3, 2006 | Phone:  310-209-8515 |
| No. of pages (including cover):  5 | Re:  American Tower CUP Renewals |

Exhibit 5
Page 55 of 90

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA  90802

# Exhibit 6

Exhibit 6
Page 56 of 80

    (B)    Limitations on the number of on-premises fund-raising or
            social activities to a specific number of occurrences each year.
*(Added 12-9-1997 by O-18451 N.S.; amended 10-18-1999 by O-18691 N.S.; effective
1-1-2000.)*

## §141.0405  Communication Antennas

(a)    Section 141.0405 regulates the following communication antennas. Amateur
(HAM) radio facilities or temporary telecommunication facilities necessitated
by natural or man-made disasters are not regulated as communication
antennas. Section 141.0405 does not apply to single dish antennas smaller
than 24 inches in diameter or to remote panel antennas less than 24 inches in
length and in width, except when associated with another telecommunication
facility.

    (1)    Minor telecommunication facilities: Antenna facilities used in wireless
telephone services, paging systems, or similar services that comply
with all development regulations of the underlying zone and overlay(s)
and that meet the criteria in Section 141.0405(e)(1) or (2).

    (2)    Major telecommunication facilities: Antenna facilities that do not
meet the criteria for minor telecommunication facilities in Section
141.0405(e)(1) or (2).

    (3)    Satellite antennas: Antennas capable of transmitting or receiving
signals to or from a transmitter or a transmitter relay located in a
planetary orbit. Satellite antennas include satellite earth stations,
television-reception-only satellite antennas , and satellite microwave
antennas.

(b)    General Rules for Telecommunication Facilities
All telecommunication facilities must comply with the following
requirements:

    (1)    All approved telecommunication facilities must comply with the
Federal standards for RF radiation in accordance with the
Telecommunication Act of 1996 or any subsequent amendment to the
Act pertaining to RF radiation. Documentation shall be submitted to
the City providing evidence that the cumulative field measurements of
radiofrequency power densities for all antennas installed on the
*premises* are below the Federal standards.

Exhibit 6
Page 57 of 80

    (2)    Except in the event of an emergency, routine maintenance and inspection of telecommunication facilities located on residentially zoned *premises*, including all of the system components, shall occur during normal business hours between 8:00 a.m. and 5:00 p.m. Monday through Friday.

    (3)    Antenna facilities or associated equipment proposed for installation in the *public right-of-way* are subject to the following regulations:

        (A)    Antennas or associated equipment located in *public right-of-way* which is adjacent to a residentially zoned *premises* may be permitted with a Neighborhood Use Permit.

        (B)    Antennas and associated equipment located in the *public right-of-way* adjacent to non-residentially zoned *premises* are subject to review and approval by the City Manager.

        (C)    All equipment associated with antenna facilities shall be undergrounded, except for small services connection boxes or as permitted in Section 141.0405(b)(4).

        (D)    A construction plan must be submitted to and is subject to review and approval by the City Engineer in accordance with Chapter 6, Article 2.

    (4)    Antennas and associated equipment located in the *public right-of-way* may be placed above ground only if the equipment is integrated into the architecture or surrounding environment through architectural enhancement (enhancements that complement the scale, texture, color, and style), unique design solutions, enhanced landscape architecture, or complementary siting solutions to minimize visual or pedestrian impacts. These facilities may be permitted with a Conditional Use Permit decided in accordance with Process Three.

  (c)    Temporary facilities that provide services to public events and are limited to a one-time maximum duration of 90 calendar days are subject to the temporary use permit procedures in Chapter 12, Article 3, Division 4.

  (d)    All telecommunication facilities that are required to obtain encroachment authorization to locate on city-owned dedicated or designated parkland or open space areas shall comply with the following:

| Ch. | Art. | Div. | |
|-----|------|------|---|
| 14 | 1 | 4 | **5** |



Exhibit 6
Page 58 of 80

(1)     The City Manager shall determine that the proposed facility would not be detrimental to the City's property interest; would not preclude other appropriate uses; would not change or interfere with the use or purpose of the parkland or open space; and would not violate any deed restrictions related to City property, map requirements or other land use regulations.

(2)     The proposed facility shall be integrated with existing park facilities or open space; shall not disturb the environmental integrity of the parkland or open space; and shall be disguised such that it does not detract from the recreational or natural character of the parkland or open space.

(3)     The proposed facility shall be consistent with The City of San Diego Progress Guide and General Plan.

(e)     Minor Telecommunication Facilities

Minor telecommunication facilities are permitted as a limited use or may be permitted with a Neighborhood Use Permit in the zones indicated with an "L" or an "N", respectively, in the Use Regulations Tables in Chapter 13, Article 1 (Base Zones) subject to the following regulations.

(1)     An antenna facility will be considered a minor telecommunication facility if the facility, including equipment and *structures*, is concealed from public view or integrated into the architecture or surrounding environment through architectural enhancement (enhancements that complement the scale, texture, color, and style), unique design solutions, or *accessory use structures*.

(2)     In an effort to encourage collocation and to recognize that some telecommunication facilities are minimally visible, the following shall be considered minor telecommunication facilities:

(A)     Additions or modifications to telecommunication facilities that do not increase the area occupied by the antennas or the existing antenna enclosure by more than 100 percent of the originally approved facility and do not increase the area occupied by an outdoor equipment unit more than 150 feet beyond the originally approved facility, if the additions and modifications are designed to minimize visibility.

Exhibit 6
Page 59 of 82

(B)     Panel-shaped antennas that are flush-mounted to an existing *building facade* on at least one edge, extend a maximum of 18 inches from the *building facade* at any edge, do not exceed the height of the building, and are designed to blend with the color and texture of the existing building.

(C)     Whip antennas if the number of antennas that are visible from the *public right-of-way* does not exceed six, if the antennas measure 4 inches or less in diameter, and if they have a mounting apparatus that is concealed from public view.

(3)     Minor telecommunication facilities are not permitted in the following locations:

   (A)     On *premises* that are developed with residential uses in residential zones;

   (B)     On vacant *premises* zoned for residential development;

   (C)     On *premises* that have been designated as *historical resources*;

   (D)     On *premises* that have been designated or mapped as containing sensitive resources;

   (E)     On *premises* within the *MHPA*; or

   (F)     On *premises* that are leased for billboard use.

(4)     The installation of a minor telecommunication facility shall not result in the elimination of required parking spaces.

(5)     Minor telecommunication facilities that terminate operation shall be removed by the operator within 90 calendar days of termination.

(f)     Major Telecommunication Facilities

Major telecommunication facilities may be permitted with a Conditional Use Permit decided in accordance with Process Three, except that major telecommunication facilities on dedicated or designated parkland and open space may be permitted with a Conditional Use Permit decided in accordance with Process Five, in the zones indicated with a "C" in the Use Regulations

| Ch. | Art. | Div. | |
|-----|------|------|---|
| 14 | 1 | 4 | **7** |

Exhibit 6
Page 61 of 80

Tables in Chapter 13, Article 1 (Base Zones) subject to the following regulations.

(1)   Major telecommunication facilities are not permitted in the following locations:

    (A)   On *premises* containing designated *historical resources*;

    (B)   Within viewsheds of designated and recommended State Scenic Highways and City Scenic Routes; or

    (C)   Within ½ mile of another major telecommunication facility, unless the proposed facility will be concealed from public view or integrated into the architecture or surrounding environment through architectural enhancement (enhancements that complement the scale, texture, color, and style), unique design solutions, and *accessory use structures*.

    (D)   Within the Coastal Overlay Zone, on *premises* within the MHPA and/or containing *steep hillsides* with *sensitive biological resources*, or within public view corridors or view sheds identified in applicable *land use plans*.

(2)   Major telecommunication facilities shall be designed to be minimally visible through the use of architecture, landscape architecture, and siting solutions.

(3)   Major telecommunication facilities shall use the smallest and least visually intrusive antennas and components that meet the requirements of the facility.

(g)   Satellite Antennas

Satellite antennas are permitted as a limited use subject to Section 141.0405(g)(2), and may be permitted with a Neighborhood Use Permit subject to Section 141.0405(g)(3), or with a Conditional Use Permit decided in accordance with Process Three subject to Section 141.0405(g)(4).

(1)   Exemption. Satellite antennas that are 5 feet in diameter or smaller are permitted in all zones and are exempt from this section.

Exhibit 6
Page 61 of 80

(2) Limited Use Regulations. Satellite antennas that exceed 5 feet in diameter are permitted as a limited use in the zones indicated with an "L" in the Use Regulations Tables in Chapter 13, Article 1 (Base Zones) subject to the following regulations.

    (A) Satellite antennas are not permitted within the *MHPA*.

    (B) Satellite antennas are not permitted on *premises* that have been designated as *historical resources*.

    (C) Satellite antennas shall not exceed 10 feet in diameter.

    (D) Ground-mounted satellite antennas shall not exceed 15 feet in *structure height*.

    (E) Ground-mounted satellite antennas shall not be located in the *street yard*, front *yard*, or *street* side *yard* of a *premises*.

    (F) Satellite antennas shall not be light-reflective.

    (G) Satellite antennas shall not have any *sign copy* on them nor shall they be illuminated.

    (H) Ground-, roof-, and pole-mounted satellite antennas shall be *screened* by fencing, buildings, or parapets that appear to be an integral part of the building, or by landscaping so that not more than 25 percent of the antenna height is visible from the *grade* level of adjacent *premises* and adjacent *public rights-of-way*.

(3) Neighborhood Use Permit Regulations. Proposed satellite antennas that do not comply with Section 141.0405(b)(2) may be permitted with a Neighborhood Use Permit subject to the following regulations.

    (A) Satellite antennas are not permitted within the *MHPA*.

    (B) Satellite antennas are not permitted on *premises* that have been designated as *historical resources*.

    (C) Satellite antennas shall not exceed 10 feet in diameter.

    (D) Satellite antennas shall not be light-reflective.

| Ch. | Art. | Div. | |
|-----|------|------|---|
| 14 | 1 | 4 | **9** |

Exhibit 6
Page 62 of 80

(E)     Satellite antennas shall not have any *sign copy* on them nor shall they be illuminated.

(F)     The visual impacts of the antenna to adjacent *premises* and adjacent *public rights-of-way* shall be minimized by the positioning of the antenna on the site and the use of landscape or other *screening*.

(4)     Conditional Use Permit Regulations. Except for proposed satellite antennas which are *accessory uses* in industrial zones, proposed satellite antennas that exceed 10 feet in diameter may be permitted only with a Conditional Use Permit decided in accordance with Process Three subject to the following regulations.

(A)     Satellite antennas are not permitted within the *MHPA*.

(B)     Satellite antennas are not permitted on *premises* or its appurtenances that have been designated as *historical resources*.

(C)     The visual impacts of the antenna to adjacent *premises* and adjacent *public rights-of-way* shall be minimized by the positioning of the antenna on the site and the use of landscaping or other *screening*.

*(Amended 1-9-2001 by O-18910 N.S.; effective 8-8-2001.)*

§141.0406     **Correctional Placement Centers**

Correctional placement centers may be permitted with a Conditional Use Permit decided in accordance with Process Four in the zones indicated with a "C" in the Use Regulations Tables in Chapter 13, Article 1 (Base Zones) subject to the following regulations.

(a)     Correctional placement centers are not permitted in any of the following locations:

(1)     Within the beach impact area of the Parking Impact Overlay Zone;

(2)     Within 1/4 mile of any type of residential care facility, *social service institution*, welfare institution, or similar type of facility, measured from *property line* to *property line* in accordance with Section 113.0225;

Exhibit 6
Page 63 of 80

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 7

Exhibit 7
Page 64 of 80



# THE CITY OF SAN DIEGO

January 19, 2006

Doug Kearney
American Tower Corporation, Inc.
2201 Dupont Drive, # 340
Irvine, CA 92612

Dear Doug:

Subject:   Sprint/Nextel Border Assessment Letter; Project No. 90476; Job Order No. 42-5670
San Ysidro Community Planning Area

The Development Services Department has completed the first review of the above referenced project.

- A wireless communication facility consisting of a new CUP to allow an existing 90' high monopole supporting 24 antennas for both Cingular and Sprint/Nextel to operate. There are two associated equipment shelters located at the base of the pole located 4350 Otay Mesa Road.

Attached to this assessment letter is a Cycle Issues Report (Enclosure 1) which contains review comments from staff representing various disciplines, outside agencies and the community planning group. The purpose of this assessment letter is to summarize the significant project issues and identify a course of action for the processing of your project.

If any additional requirements should arise during the subsequent review of your project, we will identify the issue and the reason for the additional requirement. To resolve any outstanding issues, please provide the information that is requested in the Cycle Issues Report. If you choose not to provide the requested additional information or make the requested revisions, processing may continue. However, the project may be recommended for denial if the remaining issues cannot be satisfactorily resolved and the appropriate findings for approval cannot be made.

For your information, please be advised of Section 126.0114 of the Land Development Code, which states: The development permit application file shall be closed if the applicant fails to submit or resubmit requested materials, information, fees or deposits 90 calendar days from the date the application was deemed complete or the last written request by the City, whichever is later. Once closed, the application, plans and other data submitted for review may be returned to the applicant or destroyed by the City Manager.



DIVERSITY

**Development Services**
1222 First Avenue, MS 501 • San Diego, CA 92101-4155
Tel (619) 446-5460

Exhibit 7
Page 65 of 80

Page 2
Doug Kearney
January 19, 2006

**I.    REQUIRED APPROVALS/FINDINGS -** Your project as currently proposed requires the processing of:

- **Required approvals:**
  o Process 4 Conditional Use Permit and Planned Development Permit

- If the project is redesigned to comply with the underlying zoning regulations for height, the Planned Development Permit would not be required and the process would drop to a Process Three, Hearing Officer decision.

- **Required Findings:** In order to recommend approval of your project, certain findings must be substantiated in the record. Enclosure 2 contains the required findings

**II. SIGNIFICANT PROJECT ISSUES:** The significant project issues are summarized below. Resolution of these issues could affect your project. Additional explanation is provided in the Cycle Issues Report.

**KEY ISSUES:**
- COMPLIANCE WITH CURRENT REGULATIONS
- VISIBILITY/DESIGN
- HEIGHT
- TECHNICAL ANALYSIS
- OUTDOOR STORAGE
- TIMING

1. THE PROJECT AS IT EXISTS TODAY DOES NOT COMPLY WITH SECTION 141.0405, COMMUNICATION ANTENNA REGULATIONS OR WITH CHAPTER 14, ARTICLE 1, DIVISION 4, RESIDENTIAL BASE ZONES. THE CODE REQUIRES THAT A WIRELESS COMMUNICATION FACILITY BE DESIGNED TO MINIMIZE VISUAL IMPACTS BY DESIGNING THE FACILITY SO THAT IT IS CONCEALED FROM PUBLIC VIEW OR INTEGRATED INTO THE ARCHITECTURE OR SURROUNDING ENVIRONMENT THROUGH ARCHITECTURAL ENHANCEMENT OR UNIQUE DESIGN SOLUTIONS.

2. THE PROMINENT LOCATION OF THIS PROPERTY DOES NOT LEND ITSELF TO A 90-FOOT HIGH MONOPOLE OR TO AN INSTITUTIONAL EQUIPMENT SHELTER.

3. WITH THE SIGNIFICANT IMPROVEMENTS THAT HAVE BEEN IN BOTH THE DESIGN AND TECHNICAL DISCIPLINES, IT IS EXPECTED THAT THIS FACILITY WILL BE REPLACED WITH A PROJECT THAT MORE EFFECTIVELY INTEGRATES WITH THE PROPERTY AND COMMUNITY.

Exhibit 7
Page 66 of 80

Page 3
Doug Kearney
January 19, 2006

4.  SINCE THE ORIGINAL CUP IS EXPIRED, THIS PROPOSAL IS BEING
REVIEWED AGAINST TODAYS REGULATIONS AND POLICIES AND
THEREFORE A THOROUGH TECHNICAL ANALYSIS AS DETAILED IN
INFORMATION BULLETIN 536 WILL BE REQUIRED WITH THE NEXT
SUBMITTAL. ADDITIONALLY, A DETAILED SITE JUSTIFICATION PER
COUNCIL POLICY 600-24 WILL BE REQUIRED.

5.  SECTION 142.1110(E) OF THE LAND DEVELOPMENT CODE REQUIRES
THAT ALL OUTDOOR STORAGE BE FULLY SCREENED. SEE ATTACHED
FURTHER COMMENTS IN THE ATTACHED ISSUES REPORT.

6.  SINCE THE ORIGINAL CUP IS EXPIRED AND THIS FACILITY IS NO
LONGER PERMITTED, RESOLUTION OF THESE ISSUES IS IMPERATIVE
AND A REDESIGN ADDRESSING COMPLIANCE WITH CURRENT
REGULATIONS AND POLICIES WILL BE EXPECTED WITH THE NEXT
RESUBMITTAL.

**III.    STUDIES/REPORTS REQUIRED:** A number of documents have been identified as
necessary to the project's review. Reference the attached Submittal Requirements Report
(Enclosure 3).

**IV.    PROJECT ACCOUNT STATUS:** Our current accounting system does not provide for
real-time information regarding account status, however, our records show an approximate
balance of $12,305.48.

During the processing of your project, you will continue to receive statements with the break-
down of staff charges to your account. Should you have questions about those charges, please
feel free to contact me directly.

**V.    TIMELINE:**

Upon your review of the attached Cycle Issues Report, you may wish to schedule a
meeting with staff prior to resubmitting the project. Please telephone me if you wish to
schedule a meeting with staff. During the meeting, we will also focus on key milestones
that must be met in order to facilitate the review of your proposal and to project a
potential timeline for a hearing date. Your next review cycle should take approximately
21 days to complete.

**VI.    RESUBMITTALS/NEXT STEPS:** When you are ready to resubmit, please telephone
(619) 446-5300 and request an appointment for a "Submittal-Telecom Resubmittal."
Resubmitals may also be done on a walk-in basis, however you may experience a longer than
desirable wait time. In either case, please check in on the third floor of the Development Service

Exhibit 7
Page 67 of 80

Page 4
Doug Kearney
January 19, 2006

Center (1222 First Avenue) to be placed on the list for the submittal counter. At your appointment, provide the following:

A. <u>Plans and Reports:</u> Six sets of plans as shown on the attached Submittal Requirements Report. The plans should be folded to an approximate 8 ½ x 11 inch size.

B. <u>Cycle Issues Report response letter:</u> Prepare a cover letter that specifically describes how you have addressed each of the issues identified in the Cycle Issues Report and any issues identified in this cover letter, if applicable. Or, you may choose to simply submit the Cycle Issues Report, identifying within the margins how you have addressed the issue. If the issue is addressed on one or more sheets of the plans or the reports, please reference the plan, sheet number, report or page number as appropriate. If it is not feasible to address a particular issue, please indicate the reason. Include a copy of this Assessment Letter, Cycle Issues Report and your response letter if applicable, with each set of plans.

**VII.    COMMUNITY PLANNING GROUP:** Staff provides the decision maker with the recommendation from your locally recognized community planning group. If you have not already done so, please contact David Flores, Chairperson of the San Ysidro Planning and Development Group, at (619)428-1115 to schedule your project for a recommendation from the group. If you have already obtained a recommendation from the community planning group, in your resubmittal, if applicable, please indicate how your project incorporates any input suggested to you by the community planning group.

Bulletin 620 which is available on our department website at http://www.sandiego.gov/development-services/, provides some valuable information about the advisory role the Community Planning Group. For your reference, Council Policy 600-24 available on the City website at http://clerkdoc.sannet.gov/Website/council-policy, provides "Standard Operating procedures and Responsibilities of recognized Community Planning Committees".

**VIII.    STAFF REVIEW TEAM:** Should you require clarification about specific comments from the staff reviewing team, please contact me, or feel free to contact the reviewer directly. The names and telephone numbers of each reviewer can be found on the attached Cycle Issues Report.

In conclusion, please note that information forms and bulletins, project submittal requirements, and, the Land Development Code, may be accessed on line at http://www.ci.san-diego.ca.us/development-services/industry/forms.shtml. Many land use plans for the various community groups throughout the City of San Diego are now available on line at http://www.sandiego.gov/planning/profiles/ .

Exhibit 7
Page 68 of 82

Page 5
Doug Kearney
January 19, 2006

For modifications to the project scope, submittal requirements or questions regarding any of the above, please contact me prior to resubmittal. I may be reached by telephone at (619)446-5351 or via e-mail at klynchashcraft@sandiego.gov

Sincerely,

*Karen Lynch-Ashcraft*

Karen Lynch-Ashcraft
Development Project Manager

KLA

Enclosures:

    1. Cycle Issues Report
    2. Required Findings
    3. Submittal Requirements Report

cc:    File
    David Flores, San Ysidro Planning and Development Group
    Reviewing Staff (Assessment letter only)

Rev 06-24-05/ps

document1

Exhibit 7
Page 61 of 80

# Cycle Issues

L64A-003A

THE CITY OF SAN DIEGO
Development Services
1222 First Avenue, San Diego, CA 92101-4154

1/19/2006 02:25:18 PM

Page 1 of 9

## Project Information

Project Nbr:  **90476**   Title: Sprint/Nextel - Border

Project Mgr: Lynch-Ashcraft, Karen  (619) 446-5351   klynchashcraft@sandiego.gov

## Review Cycle Information

| | | |
|---|---|---|
| Review Cycle: 1 Submitted (Multi-Discipline) [Closed] | Opened: 12/2/2005 07:23 AM | Submittal: 12/2/2005 07:37 AM |
| Deemed Complete on 12/2/2005 14:35:01 | Closed: 1/18/2006 02:30 PM | |

## Review Information

| | | |
|---|---|---|
| Reviewing Discipline: LDR-Planning Review | Requested: 12/2/2005 02:35 PM | Started: 1/11/2006 02:21 PM |
| Reviewer: Lynch-Ashcraft, Karen    (619)446-5351 | Assigned: 12/5/2005 07:50 AM | Completed: 1/18/2006 02:22 PM |
| Next Review Method: Submitted (Multi-Discipline) | Reassigned: | Needed Again: ☑ |

Exhibit 7
Page 10 of 80

p2k  v02.01.47

Karen Lynch-Ashcraft  446-5351

# Cycle Issues

THE CITY OF SAN DIEGO
Development Services
1222 First Avenue, San Diego, CA 92101-4154

L64A-003A

1/19/2006 02:25:18 PM

Page 2 of 9

**Cleared?   Issue Number and Description**

1st Review Cycle

Administrative

☐ 1 Industrial Use, RS-1-7, San Ysidro Community Plan. Adjacent to the Multiple Habitat Planning Area. Existing, expired Conditional Use Permit for a 90-foot high monopole and 200 square-foot equipment enclosure. Development regulations in RS-1-7 zone limit height to 30-feet. Planned Development Permit required for height deviation, Process Four. The following issues will require resolve prior to further processing of this CUP/PDP.

☐ 2 Since the governing CUP is expired and the existing facility no longer complies with the wireless communication antenna regulations, this proposal is being reviewed as a new project against todays regulations and policies.

☐ 3 Understanding that the network was built around this facility, it should also be recognized that the City Council imposed a 10 year restriction because it was intended that if there were a better design or technical option available at the end of the time limit, then the pole would be required to be removed. Over the past ten years, significant improvements have been made in both the design and technical fields and so it is expected that this facility be replaced with a design that more effectively integrates into the property.

☐ 4 The property is located adjacent to I-805 and is highly visible. Per section 141.0405 of the Land Development Code, telecommunication facilities shall be designed to have a minimal visual impact on surrounding communities and land uses. In addition to the prominence of this location adjacent to a major freeway corridor, residential land uses have developed around the facility necessitating the replacement of the current design.

Technical

☐ 5 Per Council Policy 600-43, this project is a Preference 2 location requiring Cingular to demonstrate why a facility in a Preference 1 location could not be utilized.

☐ 6 Certain submittal requirements are missing from the initial application. In order for staff to do a through review of the project proposal, provide a community plan land use map identifying the search ring, alternative sites, the selected site and all of the existing and approved telecom sites within a one mile radius. With the merger of Sprint and Nextel, please identify both companies' facilities on the map.

Design

☐ 7 As submitted, the project proposal does not demonstrate how the monopole will integrate with existing landscape and environs. In order to minimize the visual impact of the entire site, alternative designs and locations must be considered. The Wireless Communication Antenna regulations require integration with the surrounding architecture or environment upon which the facility is located.

☐ 8 As with the monopole, the prominent location of this facility does not lend itself to the institutional appearance of the equipment shelter. The shelter should be redesigned to minimize visual impacts. Removal of the ac units and an open roof structure with a lattice cover should be considered.

☐ 9 Per current standards for wireless telecommunication facilities, above ground cables are no longer acceptable. In order to minimize the visual impact of the facility, all cables associated with the facility must be routed underground before this permit will be considered.

☐ 10 Replacement of the chain link fence with fencing materials that integrate with the redesigned facility will be expected.

☐ 11 The RS-1-7 zone has a maximum height limit of 30-feet. In order to exceed that regulation, a Planned Development must be obtained. Revise the submitted candidate findings to justify the need to exceed the height limit while maintaining compliance with the Communication Antenna regulations. Note: a substantial reduction in height will be expected with the next submittal.

Exhibit 7
Page 71 of 80

# Cycle Issues

L64A-003A

THE CITY OF SAN DIEGO
Development Services
1222 First Avenue, San Diego, CA 92101-4154

1/19/2006 02:25:18 PM

Page 3 of 9

**Cleared?.  Issue Number and Description**

📁 **Miscellaneous**

☐ 12 The photographs provided show outdoor storage on the property. Section 142.1110(e) of the Land Development Code requires that all outdoor storage be fully screened by a combination of solid walls, fences, landscape or building. The outdoor storage must be removed prior to scheduling a public hearing on this project.

☐ 13 Nextel, having been the original permittee and American Tower, the new permittee were aware of the October 3, 1995 expiration date imposed upon this Conditional Use Permit. It is assumed by staff that Nextel has made appropriate accommodations and modifications in their network to facilitate any anticipated changes prompted by new ordinances and policies that have since gone into effect.

☐ 14 Timing is crucial on this project since the CUP is expired. It is the city's expectations that serious consideration will be given to these issues and that a timely resubmittal can be expected with most, if not all, of the issues resolved.

☐ 15 A complete site plan is required with the next submittal. Illustrate all buildings, parking and landscape existing on site.

Exhibit 7
Page 12 of 80



# Cycle Issues

**THE CITY OF SAN DIEGO**
Development Services
1222 First Avenue, San Diego, CA 92101-4154

1/19/2006 02:25:18 PM

L64A-003A

Page 4 of 9

## Project Information

Project Nbr:   **90476**   Title: Sprint/Nextel - Border

Project Mgr: Lynch-Ashcraft, Karen  (619) 446-5351   klynchashcraft@sandiego.gov

## Review Cycle Information

Review Cycle: 1 Submitted (Multi-Discipline) [Closed] | **Opened:** 12/2/2005 07:23 AM | **Submittal:** 12/2/2005 07:37 AM
Deemed Complete on 12/2/2005 14:35:01 | **Closed:** 1/18/2006 02:30 PM |

## Review Information

Reviewing Discipline: Community Planning Group | **Requested:** 12/2/2005 02:35 PM | **Started:** 1/11/2006 02:05 PM
Reviewer: Lynch-Ashcraft, Karen   (619)446-5351 | **Assigned:** 12/5/2005 07:52 AM | **Completed:** 1/11/2006 02:19 PM
Next Review Method: Submitted (Multi-Discipline) | **Reassigned:** | **Needed Again:** ☑

**Cleared?   Issue Number and Description**

📂 <u>1st Review Cycle</u>

☐ 1 The Community Group has not provided a recommendation. It is recommended that you contact David Flores, Chair of the San Ysidro Planning and Development Group at (619) 428-1115 to make arrangements to present your project for review at their next available meeting.  This group is officially recognized by the City Council as a representative of the community, and an advisor to the City in actions that would affect the community.  The community planning group is notified by the city of your pending request and copies of your project plans and documents are sent to them

Exhibit 7
Page 73 of 80



# Cycle Issues

**THE CITY OF SAN DIEGO**
Development Services
1222 First Avenue, San Diego, CA 92101-4154

1/19/2006 02:25:18 PM

L64A-003A

Page 5 of 9

## Project Information

Project Nbr:    **90476**    Title: Sprint/Nextel - Border

Project Mgr: Lynch-Ashcraft, Karen  (619) 446-5351   klynchashcraft@sandiego.gov

## Review Cycle Information

| | | |
|---|---|---|
| Review Cycle: 1 Submitted (Multi-Discipline) [Closed] | Opened: 12/2/2005 07:23 AM | Submittal: 12/2/2005 07:37 AM |
| Deemed Complete on 12/2/2005 14:35:01 | Closed: 1/18/2006 02:30 PM | |

## Review Information

| | | |
|---|---|---|
| Reviewing Discipline: Plan-Long Range Planning | Requested: 12/2/2005 02:35 PM | Started: 1/18/2006 10:05 AM |
| Reviewer: Millette, Theresa   (619)235-5206 | Assigned: 12/2/2005 02:44 PM | Completed: 1/18/2006 10:36 AM |
| Next Review Method: Submitted (Multi-Discipline) | Reassigned: | Needed Again: ☑ |

📂 011705 Review

**Cleared?    Issue Number and Description**

☑  1 The project site is designated Institution in the San Ysidro Community Plan.  The plan does not address the location of telecommunication facilities, and non-residentially designated sites typically do not conflict with the design polices in the plan.

☐  2 As this is a Process 4, the applicant should contact the Chair of the San Ysidro Community Planning Committee, David Flores, at 428-1115 to schedule the item as an agenda action item with the San Ysidro Community Planning Group.

Exhibit 7
Page 74 of 80

# Cycle Issues

THE CITY OF SAN DIEGO
Development Services
1222 First Avenue, San Diego, CA 92101-4154

1/19/2006 02:25:18 PM

L64A-003A

Page 6 of 9

## Project Information

**Project Nbr:** **90476** **Title:** Sprint/Nextel - Border

**Project Mgr:** Lynch-Ashcraft, Karen  (619) 446-5351   klynchashcraft@sandiego.gov

## Review Cycle Information

| | | |
|---|---|---|
| Review Cycle: 1 Submitted (Multi-Discipline) [Closed] | Opened: 12/2/2005 07:23 AM | Submittal: 12/2/2005 07:37 AM |
| Deemed Complete on 12/2/2005 14:35:01 | Closed: 1/18/2006 02:30 PM | |

## Review Information

| | | |
|---|---|---|
| Reviewing Discipline: ITC-Communications | Requested: 12/2/2005 02:35 PM | Started: 1/11/2006 02:02 PM |
| Reviewer: Lynch-Ashcraft, Karen    (619)446-5351 | Assigned: 12/5/2005 07:55 AM | Completed: 1/13/2006 10:27 AM |
| Next Review Method: Submitted (Multi-Discipline) | Reassigned: | Needed Again: ☑ |

**Cleared?   Issue Number and Description**

🗁 <u>1st Review Cycle</u>

☑  1 This facility is not likely to cause harmful interference or degradation of radio service on existing public
safety or other city operated communication systems.

☐  2 Any subsequent redesign requires review by IT&C.

Exhibit 7
Page 75 of 80

p2k  v02.01.47

Karen Lynch-Ashcraft  446-5351



# Cycle Issues

L64A-003A

THE CITY OF SAN DIEGO
Development Services
1222 First Avenue, San Diego, CA 92101-4154

1/19/2006 02:25:18 PM

Page 7 of 9

## Project Information

**Project Nbr:** **90476**    Title: Sprint/Nextel - Border

Project Mgr: Lynch-Ashcraft, Karen  (619) 446-5351   klynchashcraft@sandiego.gov

## Review Cycle Information

| | | |
|---|---|---|
| Review Cycle: 1 Submitted (Multi-Discipline) [Closed] | Opened: 12/2/2005 07:23 AM | Submittal: 12/2/2005 07:37 AM |
| Deemed Complete on 12/2/2005 14:35:01 | Closed: 1/18/2006 02:30 PM | |

## Review Information

| | | |
|---|---|---|
| Reviewing Discipline: LDR-Engineering Review | Requested: 12/2/2005 02:35 PM | Started: 12/22/2005 02:16 PM |
| Reviewer: Nguyen, Khanh   (619)687-5988 | Assigned: 12/5/2005 02:33 PM | Completed: 12/22/2005 02:22 PM |
| Next Review Method: Submitted (Multi-Discipline) | Reassigned: | Needed Again: ☑ |

Cleared?    Issue Number and Description

📂 1st Review Cycle

☐  1 Revise the Site Plan to show the Boundary/property line for APN 638-070-6900.

Exhibit 7
Page 76 of 80

# Cycle Issues

**THE CITY OF SAN DIEGO**
Development Services
1222 First Avenue, San Diego, CA 92101-4154

1/19/2006 02:25:18 PM

L64A-003A

Page 8 of 9

## Project Information

**Project Nbr:** 90476    **Title:** Sprint/Nextel - Border

**Project Mgr:** Lynch-Ashcraft, Karen  (619) 446-5351    klynchashcraft@sandiego.gov

## Review Cycle Information

| | | |
|---|---|---|
| Review Cycle: 1 Submitted (Multi-Discipline) [Closed] | Opened: 12/2/2005 07:23 AM | Submittal: 12/2/2005 07:37 AM |
| Deemed Complete on 12/2/2005 14:35:01 | Closed: 1/18/2006 02:30 PM | |

## Review Information

| | | |
|---|---|---|
| Reviewing Discipline: LDR-Environmental | Requested: 12/2/2005 02:35 PM | Started: 12/21/2005 01:50 PM |
| Reviewer: Szymanski, Jeffrey  (619)446-5324 | Assigned: 12/13/2005 08:42 AM | Completed: 1/18/2006 12:07 PM |
| Next Review Method: Submitted (Multi-Discipline) | Reassigned: | Needed Again: ☑ |

**Cleared?    Issue Number and Description**

📎 **Extended Initial Study**

☐ 1 Additional information is required for Land Use before an environmental review can be completed. A letter will be sent within two weeks following the close of this review cycle detailing the above issues that need to be addressed for this project.  A determination of Negative Declaration (ND), Mitigated Negative Declaration (MND) or Environmental Impact Report (EIR) will be made based on this information.

☐ 2 The project site is adjacent to the  Multi-Habitat Planning Area (MHPA). The MHPA delineates core biological resource areas and corridors and designates them as open space. This project must agree to Land Use Adjacency Guidelines. Due to the adjacency of the MHPA the project development is required to conform with the applicable Land Use Adjacency Guidelines (Sections 1.4.3.) of the MSCP Subarea Plan.

☐ 3 Any noise emanating from the facility could be considered a potential impact to the MHPA. Please provide information on the noise levels that will be emitted from the air conditioning units or any other potentially loud equipment on site. This information should be from the manufacturer of the air conditioning units. The information should contain the measured noise levels at varying distances from the units.

Exhibit 7
Page 77 of 80

p2k  v02.01.47

Karen Lynch-Ashcraft  446-5351

# Cycle Issues

**THE CITY OF SAN DIEGO**
Development Services
1222 First Avenue, San Diego, CA 92101-4154

1/19/2006 02:25:18 PM

L64A-003A

Page 9 of 9

## Project Information

Project Nbr:  **90476**   Title: Sprint/Nextel - Border

Project Mgr: Lynch-Ashcraft, Karen  (619) 446-5351    klynchashcraft@sandiego.gov

## Review Cycle Information

| | | |
|---|---|---|
| Review Cycle: 1 Submitted (Multi-Discipline) [Closed] | Opened: 12/2/2005 07:23 AM | Submittal: 12/2/2005 07:37 AM |
| Deemed Complete on 12/2/2005 14:35:01 | Closed: 1/18/2006 02:30 PM | |

## Review Information

| | | |
|---|---|---|
| Reviewing Discipline: LDR-Landscaping | Requested: 12/2/2005 02:35 PM | Started: 1/17/2006 03:43 PM |
| Reviewer: Sills, Chris   (619)446-5323 | Assigned: 12/8/2005 12:16 PM | Completed: 1/18/2006 12:44 PM |
| Next Review Method: Submitted (Multi-Discipline) | Reassigned: | Needed Again: ☑ |

Cleared?    Issue Number and Description

📂 **LSCP Review**

☐  1 Screening - Provide a minimum 80% visual screen of plant material between any chain-link fence and the public right(s)-of-way.

☐  2 Plant material shall have a minimum mature height equal to or greater than the proposed fence height.

☐  3 Vines may be used for a maximum of 25% of the screening plant material.

☐  4 Minimum Tree / Improvement Separation Distance: Traffic signals / stop sign- 20 feet; Underground utility lines - 5 feet; Above ground utility structures - 10 feet; Driveways - 10 feet.

☐  5 All landscape and irrigation shall conform to the standards of the City-Wide Landscape Regulations and the City of San Diego Land Development Manual Landscape Standards and all other landscape related City and Regional Standards.

☐  6 All required irrigation systems shall be automatic, electrically controlled, and designed to provide water to all required plantings to maintain them in a healthy, disease-resistant condition (LDC 142.0403.c.2)

☐  7 Maintenance: All required landscape areas shall be maintained by the (please specify).  Landscape areas shall be free of debris and litter and all plant material shall be maintained in a healthy growing condition.  Diseased or dead plant material shall be satisfactorily treated or replaced per the conditions of the permit.

☐  8 Additional measures may be required pending further review or redesign of project.  Reflect all project changes on the Landscape Development Plan.

Exhibit 7
Page 78 of 80

Karen Lynch-Ashcraft  446-5351

<u>**Conditional Use Permit - Section 126.0305**</u>

1.   The proposed development will not adversely affect the applicable land use plan;

2.   The proposed development will not be detrimental to the public health, safety, and welfare;

3.   The proposed development will comply to the maximum extent feasible with the regulations of the Land Development Code; and

4.   The proposed use is appropriate at the proposed location.

Exhibit 7
Page 11 of 80

# Submittal Requirements

THE CITY OF SAN DIEGO
Development Services
1222 First Avenue, San Diego, CA 92101-4154

1/19/2006 02:24:53 PM

L64A-001

Page 1 of 1

## Project Information

**Project Nbr:** **90476** **Title:** Sprint/Nextel - Border

**Project Mgr:** Lynch-Ashcraft, Karen  (619) 446-5351    klynchashcraft@sandiego.gov

## Review Cycle Information

Review Cycle: 3 Submitted (Multi-Discipline) [Accepted]     **Opened:** 1/18/2006 02:30 PM     **Submittal:**
                                                             **Closed:**

### Required Documents:

| Package Type | Pkg Qty | Document Type | Qty Needed |
|---|---|---|---|
| Development Plans | 6 | Site Development Plans | 6 |
| Photo Simulations | 2 | Photo Simulations | 2 |
| Telcom Technical Analysis | 2 | Telcom Adjacent Facility Map | 2 |
| | | Telcom Coverage Map | 2 |
| | | Telcom Search Ring | 2 |
| | | Telcom Site Justification Letter | 2 |
| | | Telecom Adjacent Land Use Map | 2 |

Exhibit 7
Page 80 of 80

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# # 148548   — SH

## March 07. 2008
## 15:51:21

## Civ Fil Non-Pris
USAO #.: 08CV0435
Judge..: JEFFREY T MILLER
Amount.:                    $350.00 CK
Check#.: BC3015421


Total—>  $350.00


FROM: AMERICCAN TOWER CORP

ORIGINAL

%JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED
08 MAR -7 PM 3: 48
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

**I. (a)  PLAINTIFFS**

American Tower Corporation, A Delaware Corporation

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff  Kent County, DE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  San Diego, California
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

08 CV 0435 JM CAB

BY FAX

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Channel Law Group, LLP
100 Oceangate, Suite 1400, Long Beach, CA  90802

Attorneys (If Known)

**II. BASIS OF JURISDICTION**  (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                        and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT**  (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability |  / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty |  |  | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other |  |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights |  |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition |  |  |  |

**V. ORIGIN**  (Place an "X" in One Box Only)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:
See attachment "A"

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

**VIII. RELATED CASE(S) IF ANY**  (See instructions):

JUDGE  Hon. Larry A. Burns

DOCKET NUMBER  3:07-cv-00399-LAB-NLS

DATE  03/07/2008

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #  148548     AMOUNT  $350     APPLYING IFP _____     JUDGE _____     MAG. JUDGE _____

SD  3/7/08

1R

## ATTACHMENT "A" – CAUSES OF ACTION

 COUNT I    --    Violation of Section 332(c)(7)(B)(i)(I) of the Telecommunications Act (47

U.S.C. § 332(c)(7)(B)(i)(I));

COUNT II    --    Violation of Section 332(c)(7)(B)(i)(II) of the Telecommunications Act

(47 U.S.C. § 332(c)(7)(B)(i)(II));

COUNT III    --    Violation of Section 332(c)(7)(B)(ii) (47 U.S.C. § 332(c)(7)(B)(ii));

COUNT IV    --    Violation of Section 332(c)(7)(B)(iii) (47 U.S.C. § 332(c)(7)(B)(iii));

COUNT V    --    Mandamus (Inherent Authority or Cal. Code Civ. Pro. §§ 1085 or 1094.5);

COUNT VI    --    Violation of Equal Protection under the Fourteenth Amendment of the

United States Constitution (U.S. Const. Am. XIV)