**ROBERT JYSTAD (Bar No. 187340)**
**JULIAN K. QUATTLEBAUM (Bar No. 214378)**
**JAMIE T. HALL (Bar No. 240183)**
**CHANNEL LAW GROUP, LLP**
**100 Oceangate, Suite 1400**
**Long Beach, CA 90802-4323**
**Telephone: (310) 982-7197**
**Facsimile: (562) 216-5090**

**Attorneys for Plaintiffs,**
**AMERICAN TOWER CORPORATION,**
**TMO CA/NV, LLC, and**
**OMNIPOINT COMMUNICATIONS, INC.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **AMERICAN TOWER CORPORATION, A DELAWARE CORPORATION; TMO CA/NV, LLC, A NEVADA LIMITED LIABILITY COMPANY; AND OMNIPOINT COMMUNICATIONS, INC., A DELAWARE CORPORATION,**<br><br>             **Plaintiffs,**<br>     **vs.**<br><br>**THE CITY OF SAN DIEGO, CALIFORNIA, A POLITICAL SUBDIVISION OF THE STATE OF CALIFORNIA,**<br><br>             **Defendant.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **Case No. 08cv0435 JM CAB**<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, WRIT OF MANDAMUS, DAMAGES, COSTS, AND ATTORNEYS' FEES** |

**BRIEF STATEMENT OF THE CASE**

1.    Plaintiff American Tower Corporation, a Delaware corporation ("ATC"), hereby complains against Defendant, the City of San Diego, California, a political subdivision of the State of California ("City") and brings this action to redress and to remedy the City's violation of federal and state laws in its denial of ATC's Conditional Use Permit ("CUP") No. 289980 ("Border CUP") related to a 90-foot monopole supporting wireless telecommunication antennas

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

1

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

(the "Border Facility") located in the vicinity of 4350 Otay Mesa in the City and the City's failure to grant ATC's request for a Planned Development Permit ("PDP") in connection with its application for the Border CUP.  ATC and Plaintiffs TMO CA/NV, LLC, a Nevada limited liability company, and Omnipoint Communications, Inc., a Delaware corporation (the "T-Mobile Plaintiffs") (collectively, ATC and the T-Mobile Plaintiffs are referred to as "Plaintiffs") further complain against Defendant and bring this action to redress and to remedy the City's violation of federal and state laws in its denial of ATC's CUP No. 423280 ("Mission Valley CUP") related to a 176.5-foot lattice tower supporting wireless telecommunication and amateur radio antennas (the "Mission Valley Facility") located in the vicinity of 9060 Friars Road in the City and the City's failure to grant ATC's request for a PDP in connection with its applications for the Mission Valley CUP.

2.    ATC also seeks a declaration from the Court that the decision issued by the City's Planning Commission (the "Planning Commission") on ATC's application for the Border CUP violates, and ATC and the T-Mobile Plaintiffs seek a declaration from the Court that the decision issued by the Planning Commission on ATC's application for the Mission Valley CUP violates, the federal Communications Act of 1934 as amended by the Telecommunications Act of 1996 (as so amended, the "Communications Act"), specifically multiple provisions of 47 U.S.C. § 332.  ATC seeks a declaration that the decision issued by the Planning Commission on ATC's application for the Mission Valley CUP violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.  Additionally, ATC and the T-Mobile Plaintiffs seek a writ of mandate from the Court ordering the City to issue a CUP and/or such other permit or permits as may be necessary for the continued maintenance and operation of the Mission Valley Facility, and ATC seeks a writ of mandate from the Court ordering the City to issue a CUP and/or such other permit or permits as may be necessary for the continued maintenance and operation of the Border Facility, as well as damages, attorney's fees and costs.

3.    There is currently pending before this Court a related action brought by ATC against the City and certain related defendants (*American Tower Corporation v. City of San*

2

*Diego, et al.*, Case No. 07cv0399 LAB (NLS)).

## JURISDICTION AND VENUE

4.     This action arises under the laws of the United States and the State of California, including the federal Supremacy Clause, U.S. Const. art. VI, cl. 2; the Fourteenth Amendment to the United States Constitution; the Communications Act, 47 U.S.C. §§ 151 *et seq.;* and the California Permit Streamlining Act, California Government Code §§ 65920 *et seq.* The Court has primary jurisdiction over federal law claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and over state law claims pursuant to 28 U.S.C. § 1332 (diversity jurisdiction). Plaintiffs and Defendant are citizens of different states and the amount in controversy and the value of the rights at issue in this action exceed the sum of $75,000 exclusive of interest and costs. The Court also has supplemental jurisdiction over California state law claims pursuant to 28 U.S.C. § 1367. The Court's authority to grant declaratory relief is based upon 28 U.S.C. § 2201. The Court's authority to grant mandamus relief is based upon its inherent authority under the Communications Act or, in the alternative, California Code of Civil Procedure § 1094.5.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendant resides within the Southern District of California and a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of California.

## PARTIES

6.     Plaintiff ATC is a corporation duly organized, existing and operating under the laws of the State of Delaware and is authorized to do, and is doing, business within the State of California. ATC has its principal place of business at 116 Huntington Avenue, Boston, Massachusetts 02116. ATC is an independent owner, operator and developer of broadcast and wireless communications sites in the United States, Mexico and Brazil. ATC owns and operates over 22,000 sites in the United States, Mexico and Brazil. Additionally, ATC manages approximately 2,000 rooftop and tower sites owned by other parties.

7.     ATC owns or manages telecommunications infrastructure, including

3

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

telecommunication towers such as the Border Facility and the Mission Valley Facility (the "Denied Facilities"), and its customers are usually wireless carriers, that is, providers of personal wireless services or commercial mobile radio services, and include, among others in addition to the T-Mobile Plaintiffs, Sprint-Nextel Corporation, Cingular Wireless (now known as AT&T), Verizon Wireless, MetroPCS Communications, Inc., and Leap Wireless International, LLC (doing business in the San Diego market under the trade name "Cricket"). ATC's infrastructure constitutes "personal wireless service facilities" within the ambit of 47 U.S.C. § 332(c)(7)(B).

8. Plaintiff TMO CA/NV, LLC is a limited liability company duly organized, existing and operating under the laws of the State of Nevada and is authorized to do, and is doing, business within the State of California. Plaintiff TMO CA/NV, LLC is a wholly-owned subsidiary of TMO CA/NV Holdings LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of plaintiff Omnipoint Communications, Inc.

9. Plaintiff Omnipoint Communications, Inc. is a corporation duly organized, existing and operating under the laws of the State of Delaware and is authorized to do, and is doing, business within the State of California.

10. The principal place of business of both TMO CA/NV, LLC and Omnipoint Communications, Inc. is the City of Bellevue, State of Washington.

11. Each T-Mobile Plaintiff is a wireless telecommunications company and has received all necessary authorizations from the California Public Utilities Commission and the Federal Communications Commission to provide wireless communications services generally and within the State of California. Each T-Mobile Plaintiff is a "telecommunications carrier" and provides "telecommunications services" as those terms are defined and used in the Communications Act, 47 U.S.C. § 153, subds. (44) and (46). The T-Mobile Plaintiffs' equipment at the Mission Valley Facility constitutes "personal wireless service facilities" within the ambit of 47 U.S.C. § 332(c)(7)(B).

12. The T-Mobile Plaintiffs own and operate facilities within the City of San Diego. The T-Mobile Plaintiffs use those facilities to provide mobile voice, data and other advanced

4

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

telecommunications services to several hundred thousand customers in the San Diego area.  As one example, the T-Mobile Plaintiffs provide Enhanced 911 services within the San Diego community.  These services offer wireless customers an important link to the City's emergency services system and help give local emergency service personnel important information about the locations of distressed callers.

13.    The T-Mobile Plaintiffs are providers of wireless telecommunications services, both intrastate and interstate, including commercial mobile radio services, also known as personal wireless services.  In order to provide these services, the T-Mobile Plaintiffs lease, or rent, property on which to place telecommunications towers and other facilities that allow the transmission and receipt of wireless signals to and from wireless devices.  The T-Mobile Plaintiffs are tenants on one or more of ATC's facilities, including the Mission Valley Facility.

14.    Defendant City of San Diego, California is a charter city organized under the laws and Constitution of the State of California.  In taking the actions complained of herein, the City acted through, among others, the City Council, the Planning Commission, the Development Services Department ("DSD") and certain staff, employees and agents responsible to these entities.

## FACTUAL BACKGROUND

### I.    ATC'S CONDITIONAL USE PERMITS

15.    In the San Diego market, ATC's predecessors in interest obtained CUPs from the City for the installation and operation of their wireless communication facilities ("WCFs").  In granting those CUPs, the City made specified findings regarding ATC's WCFs.

16.    The Border Facility was constructed pursuant to CUP No. 94-0548 (the "Original Border CUP"), which was granted by the San Diego City Council (the "City Council") effective October 3, 1995.  True and correct copies of the Original Border CUP as initially issued and the August 15, 2000 corrected version thereof are attached as Exhibit 1.  In Resolution R-286390, the City Council made certain findings in support of its grant of the Original Border CUP.  Specifically, the City Council found:

5

**Channel Law Group, LLP**
100 Oceangate, Suite 1400
Long Beach, CA 90802

"1. The proposed use . . . will not adversely affect the General Plan or the Community Plan.

". . .

"2. The proposed use, because of conditions that have been applied to it, will not be detrimental to the health, safety and general welfare of persons residing or working in the area and will not adversely affect other property in the vicinity.

". . .

"3. The proposed use will comply with the relevant regulations in the Municipal Code." Resolution R-286390, attached as Exhibit 2.

**17.** The Mission Valley Facility was constructed pursuant to CUP No. 96-0118 (the "Original Mission Valley CUP"), which was granted by the Planning Commission on September 12, 1996. A true and correct copy of the Original Mission Valley CUP is attached as Exhibit 3. In Resolution No. 2299-PC, the Planning Commission made certain findings in support of its grant of the Original Mission Valley CUP. Specifically, the Planning Commission found:

"A. THE PROPOSED USE WILL NOT ADVERSELY AFFECT THE NEIGHBORHOOD, THE GENERAL PLAN OR THE COMMUNITY PLAN. AND IF CONDUCTED IN CONFORMITY WITH THE CONDITIONS PROVIDED BY THE PERMIT, WILL NOT BE DETRIMENTAL TO THE HEALTH, SAFETY AND GENERAL WELFARE OF PERSONS RESIDING OR WORKING IN THE AREA; AND

". . . The proposed project will provide enhanced paging and wireless communication service to this community as well as to adjacent communities and will further reduce the need for additional monopoles in the area. The steel lattice tower is not located in a view corridor and would not block or obstruct views. The proposed project would reduce the need for other telecommunication providers to locate in this area or in adjacent communities.

". . .

**Channel Law Group, LLP**
100 Oceangate, Suite 1400
Long Beach, CA 90802

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"C. THE PROPOSED USE WILL COMPLY WITH THE RELEVANT

REGULATIONS IN THE MUNICIPAL CODE.

"The proposed facility would deviate from the 30'-0" height limit to allow multiple

providers to collocate on one large tower in lieu of providing multiple towers in the

surrounding vicinity.  From a distance, the lattice work of the steel tower will appear to

be translucent.  All dishes will be flush mounted to reduce the amount of visibility from

the surrounding area.

". . .

"A.  THE SITE IS PHYSICALLY SUITABLE FOR THE DESIGN AND SITING OF

THE PROPOSED STRUCTURE(S) AND WILL RESULT IN THE MINIMUM

DISTURBANCE OF SENSITIVE AREAS.

"No sensitive resources have been identified on this site.  The project as designed would

be sited to minimize any disturbance and would replace an existing facility on a graded,

flat portion of the site.

". . .

"C. THE PROPOSED DEVELOPMENT RETAINS THE VISUAL QUALITY OF THE

SITE, THE AESTHETIC QUALITIES OF THE AREA AND THE NEIGHBORHOOD

CHARACTERISTICS BY UTILIZING PROPER STRUCTURAL SCALE AND

CHARACTER, VARIED ARCHITECTURAL TREATMENTS, AND APPROPRIATE

PLANT MATERIAL.

"The proposed project . . . would visually be similar to the existing conditions.

". . .

". . . The visual environment of the existing site includes an SDGE tower, power lines,

an Airtouch facility and the existing 180-foot tower. . . ."

Resolution No. 2299-PC, attached as Exhibit 4.

    **18.**    Over the past several years, the City has revised its regulatory scheme and sought to

impose on ATC and its tenants, including the T-Mobile Plaintiffs, an increasingly burdensome

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

WCF regulatory structure.  In fact, the City refused to allow ATC to renew its CUPs on the grounds that "the majority of towers do not comply with the current development regulations for the zone in which they are located."  The City's DSD staff has repeatedly asserted that the revised regulations require ATC either to remove its WCFs or to reduce and replace its WCFs with decorative or architecturally designed structures at substantially reduced height and at tremendous cost and impact to ATC and its tenants.  The City claims that its regulations classify the Denied Facilities as "major telecommunication facilities," which, under the City's existing nomenclature, are a subclass of "communication antennas."  In an effort to demonstrate good faith with the City and in order to ensure the continued operation of the WCFs, ATC filed multiple CUP applications under protest, reserving its right to challenge the City's permitting requirements ("Protest Applications").  ATC proposed in these Protest Applications to make reasonable modifications to the landscaping and equipment, but ATC did not propose to lower the WCFs or to replace the WCFs with decorative or new architecturally designed structures.

19.    On or about December 2, 2005, ATC, as successor in interest to the owner of the Border Facility, submitted an application for a renewal of the Original Border CUP and also requested approval of a PDP.  ATC's Site Justification Letter, submitted as part of its application, is attached hereto as Exhibit 5.  ATC is informed and believes that the City did not, within 30 days thereafter, make a written determination whether such application was complete.

20.    On or about February 15, 2007, ATC, as successor in interest to the owner of the Mission Valley Facility, submitted an application for a renewal of the Original Mission Valley CUP.  Plaintiffs are informed and believe that the City did not, within 30 days thereafter, make a written determination whether such application was complete.

21.    In response to the Protest Applications, the DSD issued project assessment letters ("Assessment Letters") that, among other things, imposed unlawful requirement on ATC that created unreasonable delays in the processing of ATC's applications.  ATC objected to the findings in the Assessment Letters and sought meetings on several occasions with City staff to address its objections.  ATC has expended substantial time and resources in response to

8

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

directives arising out of these meetings only to find out that the City subsequently altered those directives, adopted contradictory directives or disavowed having made its prior directives. To avoid further delays, ATC requested that staff forward the Protest Applications to the Planning Commission "as is." The DSD communicated to ATC that a recommendation of denial would accompany the applications on grounds that the DSD could not make findings necessary to support the applications, despite the fact that, earlier in the process, the City specifically represented to ATC's representatives that the City had the discretion to recommend approval without requiring replacement of the facilities.

22.   On or about June 24, 2005, ATC's predecessor, SpectraSite Communications, Inc., met with Senior Planner Karen Lynch-Ashcraft and Planning Intern Simon Tse at the DSD to discuss the renewal of its CUPs. Ms. Lynch-Ashcraft identified Mr. Tse as the principal point of contact on CUP renewals. The goal of the meeting was to enlist the cooperation of the City in moving renewals forward on a timely basis, to request that SpectraSite be allowed to prioritize sites on the basis of expiration dates and new tenant interest and overall to demonstrate to the City SpectraSite's desire to be upfront with the City in addressing renewal and compliance issues and to work in partnership with tower tenants, the City staff and the community to achieve a mutually satisfactory outcome.

23.   In a follow-up e-mail communication, Mr. Tse reported to ATC, which had since acquired SpectraSite, that three of the CUPs for which SpectraSite had sought renewal had expired. In response to a SpectraSite inquiry regarding the amount of time it took to renew CUPs, Mr. Tse responded: "In general, you are looking at a minimum of 6 months depending on the project. If you have a specific site you are referring to let me know so I can get a better time frame, but overall CUP renewals through commission hearings will take quite at least 6 months if not more."

24.   On or about March 20, 2006, ATC and several wireless carriers met with the City in order to object to the oppressive conclusions drawn in the Assessment Letters and to discuss the absence of City guidelines governing CUP renewals. At the conclusion of the meeting, the City

9

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA  90802

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

agreed to extend the terms of any expired CUPs to June 1, 2007.  The purpose of the extension was to give the City sufficient time to develop CUP renewal guidelines.  Letter from Robert Jystad to Mr. James Waring dated March 3, 2006, attached as Exhibit 6.

25.    On September 12, 2007, the City's Hearing Officer denied the Border CUP and Mission Valley CUP (the "Denied CUPs") requested by ATC.  On September 21, 2007, ATC timely appealed the Hearing Officer's decisions to the City's Planning Commission.  As part of its presentations to both the Hearing Officer and the Planning Commission, ATC proposed certain modifications to the Denied Facilities in an attempt to respond to the City's alleged concerns about aesthetics.  As indicated above, on February 7, 2008, the Planning Commission denied the Border CUP and the Mission Valley CUP and also denied a Site Development Permit for the Border Facility for which ATC had never applied.  Neither the Hearing Officer nor the Planning Commission ruled on ATC's requests for PDPs made in connection with its requests for the Denied CUPs.

26.    On or about February 15, 2008, ATC's representative, James Kelly, received, in an envelope postmarked February 12, 2008, a close-out letter for the Border Facility dated February 7, 2008 from Karen Lynch-Ashcraft, Project Manager in the DSD, to which an unsigned copy of Planning Commission Resolution No. 4366-PC was attached.  A true and correct copy of said letter and unsigned resolution is attached hereto as Exhibit 7.  The decision of the Planning Commission denying the Border CUP is final and nonappealable to any higher authority within the City.

27.    On or about February 13, 2008, ATC's representative, Brian Cook, received a close-out letter for the Mission Valley Facility dated February 11, 2008 from Alex Hempton, an Associate Planner in the DSD, to which a copy of Planning Commission Resolution No. 4365-PC, signed by Mr. Hempton, was attached.  A true and correct copy of said letter and resolution is attached hereto as Exhibit 8.  The decision of the Planning Commission denying the Mission Valley CUP is final and nonappealable to any higher authority within the City.  ATC, therefore, is compelled to bring this litigation challenging the City's final decisions on ATC's applications

10

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

as unlawful under federal and state law.

## II.    THE CITY OF SAN DIEGO LAND DEVELOPMENT CODE

28.    ATC's applications for the Denied CUPs are governed by § 141.0405 of the City's Land Development Code as it was in effect prior to April 11, 2007 ("Prior § 141.0405").  A true and correct copy of said section as then in effect is attached hereto as Exhibit 9.

29.    Prior § 141.0405 governed Communication Antennas and imposed varying requirements on "minor telecommunication facilities" and "major telecommunication facilities."

30.    Under Prior § 141.0405, "minor telecommunication facilities" were required to be "concealed from public view or integrated into the architecture or surrounding environment through architectural enhancements (enhancements that complement the scale, texture, color, and style), unique design solutions, or accessory use structures."  San Diego Mun. Code § 141.0405(e)(1) as in effect prior to April 11, 2007.

31.    Minor telecommunication facilities were not permitted in the following locations: (a) on premises that were developed with residential uses in residential zones; (b) on vacant premises zoned for residential development; (c) on premises that had been designated as historical resources; (d) on premises that had been designated or mapped as containing sensitive resources; (e) on premises within the Multi-Habitat Protected Area; or (f) on premises that were leased for billboard use.  San Diego Mun. Code § 141.0405(e)(3) as in effect prior to April 11, 2007.

32.    The requirements for approval of "major telecommunication facilities" (*i.e.*, communication antennas that did not qualify as "minor telecommunication facilities") other than certain locational restrictions not applicable to the Border Facility and the Mission Valley Facility, were merely that they be "designed to be minimally visible through the use of architecture, landscape architecture, and siting solutions" and that they "use the smallest and least visually intrusive antennas and components that meet the requirements of the facility." San Diego Mun. Code § 141.0405(f) as in effect prior to April 11, 2007.

33.    Under § 126.0305 of the City's Land Development Code, the following are the

11

**Channel Law Group, LLP**
100 Oceangate, Suite 1400
Long Beach, CA 90802

findings required for a CUP:  (a) The proposed development will not adversely affect the applicable land use plan; (b) The proposed development will not be detrimental to the public health, safety, and welfare; (c) The proposed development will comply to the maximum extent feasible with the regulations of the Land Development Code; and (d) The proposed use is appropriate at the proposed location.  San Diego Mun. Code § 126.0305.

34.    The City indicated in its Assessment Letter and Cycle Issues Report with respect to the Border Facility, which was transmitted to Doug Kearney of ATC, by letter from Karen Lynch-Ashcraft dated January 19, 2006, that a PDP would be required for a height deviation from the 30-foot height limit in the RS-1-7 zone.  A copy of this Assessment Letter and Cycle Issues Report is attached hereto as Exhibit 10.  The City indicated in its Assessment Letter and Cycle Issues Report with respect to the Mission Valley Facility, which was transmitted to Brian Cook, ATC's representative, by letter from Alex Hempton dated April 9, 2007, that a PDP might be required.  A copy of this Assessment Letter and Cycle Issues Report is attached hereto as Exhibit 11.

35.    The purpose of a PDP is articulated in § 143.0401 of the Land Development Code: "The purpose of these regulations is to provide flexibility in the application of development regulations for projects where strict application of the base zone development regulations would restrict design options and result in a less desirable project."  San Diego Mun. Code § 143.0401. ATC has consistently pursued a PDP throughout the CUP Review Process, both in support of retention of the existing height of the Border Facility and to permit any other nonconformance with the development regulations of the applicable zone necessary for the continued operation of the critical infrastructure represented by the Denied Facilities.

36.    The findings required for a PDP under § 126.0604 of the Land Development Code are as follows:  (a) The proposed development will not adversely affect the applicable land use plan; (b) The proposed development will not be detrimental to the public health safety and welfare; (c) The proposed development will comply with the applicable regulations of the Land Development Code; (d) The proposed development, when considered as a whole, will be

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

beneficial to the community; and (e) Any proposed deviations pursuant to § 126.0602(b)(2) are appropriate for this location and will result in a more desirable project than would be achieved if designed in strict conformance with the development regulations of the applicable zone. San Diego Mun. Code § 126.0604(a).

## III.    THE FEDERAL COMMUNICATIONS ACT

**37.**    Congress adopted the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.,* and thereby created the Federal Communications Commission for, among other purposes, ". . . regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination . . . , a rapid, efficient, nationwide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies . . . ."

**38.**    In 1996, Congress amended the Communications Act of 1934 by enacting the Telecommunications Act of 1996 ("TCA"). The TCA is expansive legislation intended to increase and improve competition in the telecommunications industry. An important purpose of the TCA, as described by the Conference Report to the Senate Bill, is to "accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition . . . ." H.R. Conf. Rep. No. 458, 104th Cong., 2d Sess. 1 (1996).

**39.**    Section 332(c)(7)(B)(i)(I) states: "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--shall not unreasonably discriminate among providers of functionally equivalent services."

**40.**    Section 332(c)(7)(B)(i)(II) further provides that State or local government regulation of personal wireless service facilities "shall not prohibit or have the effect of

13

prohibiting the provision of personal wireless services."

41.    Section 332(c)(7)(B)(ii) provides that a State or local government shall "act on any request to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed . . . ."

42.    Section 332(c)(7)(B)(iii) states that "any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

## IV.    THE PERMIT STREAMLINING ACT (CAL. GOV. CODE §§ 65920 *ET SEQ.*)

43.    Cal. Gov. Code § 65940(a) requires each state agency and each local agency to "compile one or more lists that shall specify in detail the information that will be required from any applicant for a development project."  The section also requires the information to "be made available to all applicants for development projects and to any person who requests the information."

44.    Cal. Gov. Code § 65941(a) mandates:  "The information compiled pursuant to Section 65940 shall also indicate the criteria which the agency will apply in order to determine the completeness of any application submitted to it for a development project."  All of this information is required, under Gov. Code § 65942, to be revised as necessary so as to "be current and accurate at all times."  That section further provides:  "Any revisions shall apply prospectively only and shall not be a basis for determining that an application is not complete . . . if the application was received before the revision is effective" with two narrow exceptions.

45.    Although an agency is permitted to defer requiring some of the information needed until after the completion of the application, Cal. Gov. Code § 65944(a) prohibits an agency which has accepted an application as complete from subsequently requesting information not specified in the list.  "Prior to accepting an application, each public agency shall inform the applicant of any information included in the list prepared pursuant to Section 65940 which will subsequently be required from the applicant in order to complete final action on the application."  Gov. Code § 65944(b).

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

14

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA  90802

46.    Cal. Gov. Code § 65943 sets forth the time limits for determining the completeness of an application.  As to the initial submission of an application, subsection (a) of that section requires: "Not later than 30 calendar days after any public agency has received an application for a development project, the agency shall determine in writing whether the application is complete and shall immediately transmit the determination to the applicant for the development project.  If the written determination is not made within 30 days after receipt of the application, and the application includes a statement that it is an application for a development permit, the application shall be deemed complete for purposes of this chapter."

47.    Cal. Gov. Code § 65943(a) also requires the government agency to specify in detail the shortcomings of any application deemed incomplete:

"If the application is determined not to be complete, the agency's determination
shall specify those parts of the application which are incomplete and shall indicate
the manner in which they can be made complete, including a list and thorough
description of the specific information needed to complete the application."

48.    Cal. Gov. Code §§ 65950-65952 sets forth mandatory time limits for approval or disapproval of a development project.  Gov. Code § 65956(b) provides that in the event of a failure by an agency to meet the required deadlines for approval or disapproval, "the failure to act shall be deemed approval of the permit application for the development project.  However, the permit shall be deemed approved only if the public notice required by law has occurred." The statute provides specific means for the applicant to provide the required public notice if the lead agency fails to do so.  Gov. Code § 65953 specifically *requires* agencies to act more quickly to the extent possible:

"All time limits specified in this article are maximum time limits for approving or
disapproving development projects.  All public agencies shall, if possible,
approve or disapprove development projects in shorter periods of time."

The City has failed to comply with the Permit Streamlining Act's timing requirements both as to its determinations of completeness and its action on ATC's requested PDPs.

15

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

## SUMMARY OF HARM AND FACTS REQUIRING
## DECLARATORY AND INJUNCTIVE RELIEF

49.     The foregoing allegations demonstrate that an actual controversy now exists between the Plaintiffs and the City, as to whether the City's denials of ATC's Denied CUPs violate and are preempted by federal and state law and are, therefore, void and invalid.  An actual controversy also now exists as to whether ATC, and the T-Mobile Plaintiffs in the case of the Mission Valley Facility, are entitled to an order compelling the City to issue appropriate permits for the continued operation of ATC's Border Facility and Mission Valley Facility forthwith. Plaintiffs' rights, status and other legal relations have been immediately and adversely affected by the City's actions.

50.     As a result of the City's actions complained of herein, Plaintiffs have been, and will continue to be, absent the relief requested herein, damaged and irreparably harmed.  The harm caused by the City's unlawful denial of ATC's CUPs includes, but is not limited to, the following: (a) ATC and the many carriers utilizing ATC's facilities (hereinafter "Tenants"), which include the T-Mobile Plaintiffs, will be required to remove and/or replace their equipment currently in operation and currently providing wireless communication services; (b) ATC and its Tenants will be required to reconfigure wireless communication networks in order to accommodate the loss and/or modifications of their facilities; (c) ATC has expended substantial amounts of time and resources negotiating with the City over the renewal process applicable to its Denied CUPs; (c) the Plaintiffs are being deprived of the full utilization of their existing licenses and business investments, as well as lost revenue for services; (d) Plaintiffs will lose customers due to the loss of irreplaceable services as a result of the denial of the Denied CUPs; and (e) Plaintiffs are being deprived of good will and business reputation, both present and future, associated with loss of present and future improved services that they will not be able to offer in the City if ATC is not permitted to continue to operate its Denied Facilities.

16

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

## COUNT I

### Violation of Section 332(c)(7)(B)(i)(I) of the Communications Act

### (47 U.S.C. § 332(c)(7)(B)(i)(I))

**51.**    The Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 50 above.

**52.**    47 U.S.C. § 332(c)(7)(B)(i)(I) prohibits State and local governments from utilizing policies and procedures and from enacting regulations that "unreasonably discriminate among providers of functionally equivalent services."

**53.**    On February 7, 2008, the City denied ATC's requests for the Denied CUPs on the grounds that the Denied Facilities do not comply with the City's regulations.  The City, acting in its proprietary capacity, leases space on city-owned telecommunication towers for commercial purposes in and around the City in direct competition with ATC.  The City exempts its towers from its zoning requirements.  Some of these towers are monopoles of the same general design as ATC's Border Facility and lattice towers similar to ATC's Mission Valley Facility.  The City's towers are not distinguishable from ATC's Denied Facilities in terms of the criteria which form the basis of the City's denial of ATC's CUPs.  The City has proffered no reasonable basis for differentiating these city facilities from ATC's Denied Facilities.  Accordingly, the City's denials of the Denied CUPs unreasonably discriminate against ATC, which provides functionally equivalent services to those provided by the City in making space available for lease on its towers for placement of commercial wireless antennas.

**54.**    Accordingly, the City's denials of the Denied CUPs violate 47 U.S.C. § 332(c)(7)(B)(i)(I) and should be set aside on those grounds.

## COUNT II

### Violation of Section 332(c)(7)(B)(i)(II) of the Communications Act

### (47 U.S.C. § 332(c)(7)(B)(i)(II))

**55.**    The Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 54 above.

17

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

56.    47 U.S.C. § 332(c)(7)(B)(i)(II) provides that any regulation of personal wireless service facilities shall not "prohibit or have the effect of prohibiting the provision of personal wireless service."

57.    The Denied Facilities, as well as others, are existing facilities that comprise the backbone of ATC's carrier customers' (including the T-Mobile Plaintiffs') networks in the City of San Diego.  Removal of the Denied Facilities will have a substantial impact on the carriers' (including the T-Mobile Plaintiffs') networks, resulting in significant gaps in service where no such gaps currently exist.  The Denied Facilities are existing facilities that have already been determined to comply with City requirements.  No changes have occurred to the areas in which the Denied Facilities are located that warrant replacement or relocation.

58.    The denial of ATC's request for CUPs to continue operation of the Denied Facilities, if upheld, will result in the creation of significant gaps in services for many of the Tenants (including the T-Mobile Plaintiffs) utilizing the Denied Facilities, as shown by uncontroverted evidence in the record.  Furthermore, the manner in which the existing facilities currently fill those significant gaps is the least intrusive on the values addressed by the applicable provisions of the City's Municipal Code.  In addition, the least intrusive alternative test requires a special application in the context of this case.  Where facilities have already been deployed in the formation of a complex wireless network, forced removal of these facilities solely on subjective and arbitrary aesthetic grounds, which removal would result in new gaps in services and the need for extensive network reconfiguration with new land use impacts, should constitute effective prohibition of services under § 332(c)(7)(B)(i)(II), and the City's denials should be set aside on those grounds.

59.    Accordingly, the City's denials of ATC's CUPs should be found to be in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) and set aside, and the requested CUPs should be granted.

18

**Channel Law Group, LLP**
100 Oceangate, Suite 1400
Long Beach, CA 90802

**COUNT III**

**Violation of Section 332(c)(7)(B)(ii) of the Communications Act**

**(47 U.S.C. § 332(c)(7)(B)(ii))**

**60.**     The Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 59 above.

**61.**     47 U.S.C. § 332(c)(7)(B)(ii) requires that a local government "act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request."

**62.**     It has been more than two years since ATC applied for a PDP for the Border Facility and one year since ATC's application for the Mission Valley Facility.  Despite numerous hearings and decisions by both the City's Hearing Officer and the Planning Commission on ATC's applications for these CUPs, the City has not made any decision on ATC's requests for PDPs.  This delay violates the provisions of the Permit Streamlining Act and is unreasonable.

**63.**     Accordingly, the City's failure to approve ATC's PDPs should be found to be in violation of 47 U.S.C. § 332(c)(7)(B)(ii), and the Court should order the City to issue the requested PDPs.

**COUNT IV**

**Violation of Section 332(c)(7)(B)(iii) of the Communications Act**

**(47 U.S.C. § 332(c)(7)(B)(iii))**

**64.**     The Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 63 above.

**65.**     47 U.S.C. § 332(c)(7)(B)(iii) requires that any decision by a State or local government to deny a request to place, construct, or modify personal wireless service facilities "shall be in writing and supported by substantial evidence contained in a written record."

**66.**     On February 7, 2008, the City finally denied ATC's requests for the Denied CUPs. However, these decisions were based on conclusory findings which were not supported by

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

substantial evidence in the record.  The decisions of the Planning Commission were also tainted by staff's insistence on requirements related to the CUP applications that were unlawful in light of the City's failure to comply with the Permit Streamlining Act.  Furthermore, the Planning Commission, in making its decisions, failed to follow the applicable requirements of the City's Land Development Code.  For example, the Planning Commission's findings state: "Since 2000, the City has had a Communication Antenna ordinance that requires architectural or environmental integration with the project site."  This appears to be a reference to the definitional provision in Prior § 141.0405(e)(1) of the Land Development Code referred to in paragraph 30 above:  "An antenna facility will be considered a minor telecommunication facility if the facility, including equipment and structures, is concealed from public view or integrated into the architecture or surrounding environment through architectural enhancement (enhancements that complement the scale, texture, color, and style), unique design solutions, or accessory use structures."  However, neither of the Denied Facilities was processed by the City as a "minor telecommunication facility," but rather each was processed as a "major telecommunication facility."  The Planning Commission's findings also state that "[t]he intent of the regulations is to camouflage facilities from public view."  While this may be true of the regulations governing minor telecommunication facilities, it is not the standard found in the Land Development Code for major telecommunication facilities.

67.    In addition, the Planning Commission failed to consider the qualification found in the required findings for issuance of a CUP that the development need only comply with the regulations of the Land Development Code "to the maximum extent feasible."  San Diego Mun. Code § 126.0305(c).  The record contains no evidence of any analysis (other than speculation) by the Planning Commission or the City's staff of whether it was "feasible" to comply with the requirements of the Land Development Code to any greater extent than as proposed by ATC, and the City ignored expert testimony that it was not feasible to do so.  The Planning Commission also failed to even consider the applicability of the Land Development Code's provisions regarding PDPs, which, as indicated above, provide flexibility to avoid "strict application of the

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

base zone development regulations."

68.   The discussion under each of the requisite "Findings" attached to the Planning Commission's resolutions (Nos. 4365-PC and 4366-PC), in several instances, does not even evidence a reasoned consideration of relevant issues.  In the face of the previous findings on largely identical issues by the City Council in support of the Original Border CUP and the Planning Commission in support of the Original Mission Valley CUP, and the vote of the local Community Planning Groups to support ATC's applications with only the modifications proposed by ATC, the record does not provide substantial evidence to support the Planning Commission's denials.

69.   In addition, the record does not establish that the resolutions transmitted by Karen Lynch-Ashcraft and Alex Hempton as attachments to their close-out letters were ever adopted by the Planning Commission since neither resolution was signed by a member of the Planning Commission and the motions on which the Planning Commission voted at its February 7, 2008 hearing made no reference to such findings.  The motions approved by the Planning Commission were to uphold the decisions of the Hearing Officer, which was based on different findings.  (The Hearing Officer explicitly made three of the required four findings but also failed to consider the "to the maximum extent feasible" qualification of the fourth.)  The City's denials were based on the wholly subjective and arbitrary aesthetic criteria of City staff, and the findings appeared to have been prepared and adopted by staff without any consideration by the Planning Commission and are, in some respects, directly contradictory to statements made during the final hearing by several of the members of the Planning Commission who voted to deny the permits.  Accordingly, the City's denials of ATC's CUPs are not supported by substantial evidence contained in a written record.

70.   Accordingly, the City's actions should be found to be in violation of 47 U.S.C. § 332(c)(7)(B)(iii) and set aside, and the requested permits should be granted.

21

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

## COUNT V

### Mandamus

### (Inherent Authority or Cal. Code Civ. Pro. § 1094.5)

71.    The Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 70 above.

72.    Plaintiffs bring the Count for Mandamus pursuant to the Court's inherent authority under the Communications Act, or, in the alternative, Cal. Code of Civ. Pro. § 1094.5.  In either event, this court has jurisdiction to hear this claim under 28 U.S.C. §§ 1331 and 1332, and under the supplemental jurisdiction conferred by 28 U.S.C. § 1367(a).

73.    The City, in denying ATC's CUPs, has violated federal law as set forth in this Complaint.  The City therefore is under a mandatory duty to issue a CUP and any required PDPs to permit ATC to continue to maintain and operate the Denied Facilities.

74.    The Plaintiffs are beneficially interested in the issuance of a writ of mandamus.  As the applicant for the CUPs at issue, ATC's rights and interests have been and will be adversely affected, and the full use and enjoyment of its property will be denied, unless the City is compelled by the Court to issue CUPs to permit ATC to continue to maintain and operate the Denied Facilities.  The loss of the Mission Valley Facility will have a direct negative impact on the T-Mobile Plaintiffs' network and their ability to serve their customers.  Furthermore, the loss of the Border Facility will permit the City to eliminate competition for tenants of its antenna space and will enable the City to charge noncompetitive prices.

75.    Plaintiffs respectfully request that the Court issue a writ of mandamus pursuant to its inherent authority under the Communications Act, or, in the alternative § 1094.5, compelling the City thereby to issue CUPs and, if necessary, PDPs, to permit ATC to continue to maintain and operate the Denied Facilities consistent with the requirements of federal law.

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA 90802

## COUNT VI

### Violation of Equal Protection under the Fourteenth Amendment

### to the Constitution of the United States

### (U.S. Const. amend. XIV)

**76.** ATC incorporates herein by reference the allegations of paragraphs 1 through 75 above.

**77.** Amendment XIV to the United States Constitution provides, in pertinent part, that no State shall "deprive a person of life, liberty, or property, without due process of law, nor deny any person within its jurisdiction the equal protection of the laws." Thus, ATC is entitled to the equal protection of the laws, and to be free from unlawful discrimination in statutory classifications and other governmental activities.

**78.** The City's commercial activities related to the leasing of space on its telecommunications towers for third-party commercial antennas, as indicated above, is directly competitive and indistinguishable on any rational basis from the commercial activities in which ATC utilizes the Denied Facilities.

**79.** However, the City, acting in an arbitrary and capricious manner, has imposed requirements on ATC in the conduct of its commercial activities from which the City has exempted itself.

**80.** The allegations set forth above demonstrate that the City has violated ATC's equal protection rights by imposing requirements upon and taking or failing to take action with respect to ATC's WCFs which it has not imposed on or taken or failed to take with respect to the City's own telecommunications towers, even when such towers are being utilized in a proprietary, nongovernmental capacity. There is no rational basis for the City's distinction between the City's towers and activities and those of ATC. The City's imposition of special requirements and its denial of permits necessary for ATC to continuing to operate the Denied Facilities constitutes a denial of ATC's right to equal protection of the laws in violation of the Fourteenth Amendment of the United States Constitution.

81.    Accordingly, the City's actions should be declared to be a denial of ATC's rights to equal protection, and should be set aside and enjoined by the Court on that basis.  Further, the Court should issue an order commanding the City to grant appropriate permits so that ATC may continue to maintain and operate the Denied Facilities.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1.    Under Count I, that the Court issue an Order declaring that the City's denials of ATC's CUPs constitute unreasonable discrimination under 47 U.S.C. § 332(c)(7)(B)(i)(I) and, therefore, are void, invalid, and unenforceable;

2.    Under Count II, that the Court issue an Order declaring that the City's denials of ATC's CUPs constitute actual or effective prohibition under 47 U.S.C. § 332(c)(7)(B)(i)(II) and, therefore, are void, invalid, and unenforceable;

3.    Under Count III, that the Court issue an Order declaring the City has failed to act on ATC's requests for PDPs within the time limits mandated by the Permit Streamlining Act and that the City has therefore failed to act on such requests within a reasonable period of time in violation of 47 U.S.C. § 332(c)(7)(B)(ii);

4.    Under Count IV, that the Court issue an Order declaring that the City's denials of ATC's CUPs are not supported by substantial evidence in a written record as required by 47 U.S.C. § 332(c)(7)(B)(iii) and, therefore, are void, invalid, and unenforceable

5.    Under Count V, that the Court issue a writ of mandamus pursuant to its inherent authority under the Communications Act, or in the alternative, under Cal. Code. Civ. Pro. § 1094.5 ordering the City to grant ATC its requested CUPs and/or such other permit or permits as may be necessary for the continued maintenance and operation of the Denied Facilities;

6.    Under Count VI, that the Court issue an Order declaring that the City's differential treatment of ATC's towers and those of the City utilized by it in competition with ATC is violative of ATC's rights to equal protection under the Fourteenth Amendment to the U.S. Constitution;

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA  90802

7.    For costs of suit;

8.    For damages for Plaintiff ATC in an amount to be established by the evidence;

9.    For attorneys' fees (including expert fees) in accordance with the provisions of 42 U.S.C. § 1988 and as may be otherwise provided by law for the violation of ATC's rights, privileges and immunities; and

10.    For such other and further relief as the court may deem just and proper.

Respectfully submitted,

Dated: March 12, 2008                          **CHANNEL LAW GROUP, LLP**


_/s/ Robert Jystad_____
Robert Jystad

*Attorney for Plaintiffs*
*American Tower Corporation,*
*TMO CA/NV, LLC, and*
*Omnipoint Communications, Inc.*

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA  90802

**EXHIBIT LIST**

Channel Law Group, LLP
100 Oceangate, Suite 1400
Long Beach, CA  90802

| Number | Exhibit |
|--------|---------|
| 1 | CUP No. 94-0548 |
| 2 | Resolution R-286390 |
| 3 | CUP No. 96-0118 |
| 4 | Resolution No. 2299-PC |
| 5 | Site Justification Letter (Border Facility application) |
| 6 | Letter re blanket extension from Robert Jystad, Esq., to James Waring dated March 3, 2006 |
| 7 | Closeout letter from Karen Lynch-Ashcraft to Jim Kelly dated February 7, 2008 and unsigned copy of Resolution No. 4366-PC |
| 8 | Closeout letter from Alex Hempton to Brian Cook dated February 11, 2008 and Planning Commission Resolution No. 4365-PC |
| 9 | Land Development Code § 141.0405 as in effect prior to April 11, 2007 |
| 10 | Border Facility Assessment Letter from Karen Lynch-Ashcraft to Doug Kearney dated January 19, 2006 and Cycle Issues Report |
| 11 | Mission Valley Facility Assessment Letter from Alex Hempton to Brian Cook dated April 9, 2007 and Cycle Issues Report |

FIRST AMENDED COMPLAINT